# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

NATHANIEL WEBSTER, JR.,                    Case No. 1:15-cv-329
    Petitioner,

                                    Black, J.
    vs.                                    Bowman, M.J.

WARDEN, BELMONT                            **REPORT AND**
CORRECTIONAL INSTITUTION,                  **RECOMMENDATION**
    Respondent.

Petitioner, a former prisoner at the Belmont Correctional Institution,[1] through counsel, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the petition, respondent's return of writ, and petitioner's reply. (Doc. 1, 12, 15). For the reasons stated below, the petition should be denied.

## I. FACTUAL BACKGROUND[2]

The Ohio Court of Appeals set forth the following set of facts leading to petitioner's conviction and sentence:[3]

---

[1] The Hamilton County Clerk of Court's online docket records indicate that on May 26, 2021 petitioner was granted judicial release pursuant to Ohio Rev. Code § 2929.20 and is currently on community control. This Court may take judicial notice of court records that are available online to members of the public. *See Lynch v. Leis*, 382 F.3d 642, 648 n.5 (6th Cir. 2004) (citing *Lyons v. Stovall*, 188 F.3d 327, 332 n.3 (6th Cir. 1999)).

[2] This action was transferred to the undersigned's docket several years after it was filed. The Court recognizes that the case has been fully briefed, with a complete record, since April 2, 2020. (*See Doc. 20*). The intention of the undersigned is to rule timely on matters before her. Unfortunately, that did not happen here and the Court regrets the delay in this action.

[3] 28 U.S.C. § 2254(e)(1) provides that "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed correct" unless petitioner rebuts the presumption by "clear and convincing evidence." Petitioner has presented his own statement of facts in the petition, before generally asserting that "[t]he preceding statement of facts establishes clear and convincing evidence that the state courts unreasonably determined the facts." (Doc. 1 at PageID 32). However, petitioner has failed to demonstrate that the Ohio Court of Appeals made an unreasonable determinization of any particular fact. To the extent that petitioner contends the evidence was insufficient to support his convictions, raises other grounds for relief related to the evidence introduced against him, or raises specific arguments concerning factual determinations made by the state appellate court in his grounds for relief, these claims are addressed below. Because petitioner has otherwise neither cited nor presented clear and convincing evidence to rebut the Ohio Court of Appeals' factual findings quoted herein, the state appellate court's factual findings are presumed to be correct. *See McAdoo v. Elo,* 365 F.3d 487, 493-94 (6th Cir. 2004).

{¶4} In 2009, Jackson and Webster lived in the same neighborhood only a few houses away from each other. Jackson was a 15–year–old high school sophomore. She lived with her parents and siblings. Webster was married and had several children. According to Jackson, she began babysitting for Webster's family in 2009, and a sexual relationship soon ensued. Webster admitted to police that he had had a sexual relationship with Jackson. The main issue at trial was the timing of the alleged sexual activity, and whether it occurred when Jackson was only 15 years old. Webster's mens rea as to Jackson's age was also an issue.

The September 2009 Charge

{¶5} In regard to the charge that Webster and Jackson had engaged in sexual intercourse in September 2009, Jackson testified that during that month while she and a friend, Chloe Kelly, were getting ready to go to a high school football game, Webster texted Jackson on her cellular telephone asking to see her. Jackson told Webster that she was at Kelly's house. Webster picked her up there and drove Jackson to his house where, according to Jackson, they engaged in sexual intercourse in his bedroom while Webster's wife was out. Kelly corroborated details of Jackson's testimony regarding the texting and Jackson leaving her house unexpectedly. Kelly also testified that Jackson had told her in the fall of 2009 that Jackson had been having a sexual relationship with Webster.

{¶6} In further support of the September 2009 charge, the state introduced cellular telephone records showing that there were 256 telephone calls and text messages between Jackson's and Webster's telephones that month.

The October 2009 Charge

{¶7} Michelle Jackson, Jackson's mother, testified that she was having a difficult time contacting her daughter on October 30, 2009. Michelle remembered the date clearly because it was the day before her premature newborn baby was coming home from the hospital. Since Michelle could not find Jackson, she decided to drive around the neighborhood to look for her. Michelle discovered Jackson and Webster together in Webster's car as Webster was driving into the subdivision where they lived. At trial, Jackson testified that she had not had sexual intercourse with Webster on the evening that her mother had caught her, but that she had had sexual intercourse with Webster a number of times that month in Webster's house. Jackson also testified that Webster had told her that he loved her on October 28, 2009. Jackson had marked the date on her calendar. The calendar was admitted into evidence.

{¶8} Hue Jackson, Jackson's father, testified that he telephoned Webster about this incident, asking if anything inappropriate was occurring between Webster and Jackson. During this call, Hue told Webster that Jackson was only 15 years old. Hue explained to the jury that he was sure of the date that he had called Webster because he had been the head coach of the Oakland Raiders at the time, and he

remembered that his team was playing the Denver Broncos that Sunday.  He was also sure of the timing because his newborn daughter was soon to come home from the hospital.

{¶9} As further evidence that there was a relationship between Webster and Jackson, the state submitted evidence that Webster and Jackson had had 84 cellular telephone contacts that month.

The November 2009 Charge

{¶10} After Jackson had been caught with Webster in his car, she had been "grounded."  But, according to Jackson, she continued to see Webster two to three times a week during November 2009.  Jackson testified that she would tell her mother that she was going jogging in the neighborhood and instead would meet Webster at a predetermined location.  Jackson stated that she and Webster had sexual intercourse in his car on these occasions while the car was parked in an apartment building parking lot or in the parking lot of a nearby retirement center. Jackson also testified that, in November 2009, she had a heart with Webster's initial tattooed on her body.

{¶11} Michelle Jackson testified that, in November 2009, she would frequently watch her daughter leave to go jogging in the neighborhood, and at the same time would notice a car leaving Webster's driveway.  Michelle was sure that these events occurred in November 2009 because she would watch Jackson from a second floor window as she fed her newborn baby.  According to Michelle, her daughter would be gone 30 to 40 minutes at a time on these occasions, and when she returned she did not look as if she had been running.

{¶12} In further support of the November 2009 charge, the state introduced into evidence telephone records showing 125 telephone contacts between Jackson's cellular telephone number and Webster's cellular telephone number during that month.

The December 2009 Charge

{¶13} In regard to the December 2009 charge, the state introduced records showing 117 telephone contacts between Webster's telephone number and Jackson's telephone number that month.  The state did not present evidence of sexual contact between Jackson and Webster during this month, and Jackson testified that she thought that Webster had left town in December 2009.

Evidence in Support of all Charges

{¶14} In support of all of the charges, the state played a series of taped conversations between Jackson and Webster that Jackson had secretly recorded at the direction of investigating police officers.  In them, Webster references his and

3

Jackson's sexual relationship but is vague as to its timing.  In one of the calls, Webster joked with Jackson about how young she was.  That call was made in 2011.

{¶15} Finally, the state produced a taped confession in which Webster admitted to detective Brian Pitchford that he and Jackson had had a sexual relationship. Webster stated that he didn't know exactly when the relationship began, but that he remembered Hue Jackson confronting him about being alone with his daughter in Webster's car.  Webster implied that he had been sexually involved with Jackson at the time that Hue had called.  He also admitted that the relationship may have started in 2009.  And he confessed that he and Jackson would text each other to arrange their sexual encounters.  Webster further confessed that he didn't know how old Jackson was at the time that he had started a sexual relationship with her. He thought that she may have been "15, 14, 16."

Webster's Defense

{¶16} At trial, Webster attempted to discredit the state's version of events as it related to the timing of their relationship and also attempted to establish that Jackson appeared to be older than she was.

{¶17} During the cross-examination of the state's witnesses, the defense drew out inconsistencies in some of the testimony, and highlighted Jackson's inability to remember specific dates.  The defense also elicited testimony from Jackson suggesting that Pitchford may have coached her as to the timing of her relationship with Webster.  And the defense thoroughly questioned Pitchford concerning Webster's confession.  Counsel focused on Pitchford's numerous leading questions concerning the dates at issue, pointing out that Webster could not remember specific dates until Pitchford suggested the dates to him.

{¶18} Several witnesses for the defense were called.  Webster's brothers-in-law, nicknamed "Redman" and "Bud," were living with Webster in 2009.  They testified that they and each of their girlfriends had had almost exclusive use of Webster's cellular telephone during the months in question.  Other witnesses for the defense corroborated this testimony, stating that it was difficult to reach Webster on his cellular telephone because he did not answer it.  According to Redman and Bud, Jackson sold marijuana to them on a regular basis and the telephone calls and texts between Jackson's cellular telephone and Webster's cellular telephone often concerned a marijuana sale.

{¶19} Witnesses for the defense also testified that Jackson appeared to be older than 15 years old, claiming that Jackson had been driving in the fall of 2009 and that she had been admitted to a night club after showing identification.

{¶20} Webster's wife, Jennifer, testified that Webster was out of town many times throughout the four-month span at issue.  Jennifer believed that Webster had been having an affair in June 2010 based on how Webster had been acting at the time

and also based on certain health issues that Jennifer developed in August 2010 that had required a trip to the gynecologist.

(Doc. 11, Ex. 18 at PageID 311–16).

## II. PROCEDURAL BACKGROUND

### State Trial Proceeding

In June 2011, the Hamilton County, Ohio grand jury returned a seven-count indictment, charging petitioner with one count of gross sexual imposition, one count of sexual battery, and five counts of unlawful sexual conduct with a minor. (Doc. 11, Ex. 1). Each count in the indictment specified a one month time period in 2009 during which the charges were alleged to have occurred. (*See id.*). Petitioner pled not guilty to the charges in the indictment.

Petitioner filed a motion to sever the count of gross sexual imposition from the remaining counts for the purposes of trial. (Doc. 11, Ex. 3). Petitioner argued that evidence of the victim's sexual activity is only admissible in very limited circumstances with respect to gross sexual imposition, pursuant to Ohio Rev. Code § 2907.05(E), Ohio's rape shield statute. (*Id.* at PageID 149). The remaining charges did not contain the "rape shield" applicable to the gross sexual imposition count and petitioner argued that joinder of all counts would therefore prevent him from presenting evidence as to the remaining counts of sexual battery and unlawful sex with a minor. The motion was denied by the trial court. (Doc. 11, Ex. 5).

On April 25, 2012, following a jury trial, petitioner was found guilty of four counts of sexual conduct with a minor. (Doc. 11, Ex. 9). He was acquitted of the remaining charges of gross sexual imposition, sexual battery, and unlawful sexual conduct with a minor with respect to August 2009. (Doc. 11, Ex. 10).

On May 8, 2012, petitioner, through counsel, filed unsuccessful motions for acquittal after verdict pursuant to Crim. R. 29(C) and for a new trial. (*See* Doc. 11, Ex. 11, 12). On June

5

13, 2012, petitioner was sentenced to a total aggregate prison sentence of twelve years in the

Ohio Department of Corrections.  (Doc. 11, Ex. 13).

### Direct Appeal

Petitioner, through new counsel, filed a notice of appeal to the Ohio Court of Appeals.

(Doc. 11, Ex. 14).  Petitioner raised the following eleven assignments of error in his appellate

brief:

ASSIGNMENT OF ERROR I:  As the offenses were neither charged nor proven with
sufficient specificity, Webster was denied his Fifth, Sixth, Eighth, and Fourteenth
Amendment due process rights: (1) to notice of the specific charges against him; (2) to
present a defense; (3) to confront the State's evidence; (3) to have the State prove his
guilt beyond a reasonable doubt; and (4) to be protected against double jeopardy and
cruel and unusual punishment.

ASSIGNMENT OF ERROR II:  Insufficient evidence exists to support four separate
counts of "unlawful sexual conduct with a minor" in violation of Webster's state and
federal constitutional rights to due process and a fair trial.

ASSIGNMENT OF ERROR III:  Plain error in violation of Webster's rights to due
process, to confront the State's evidence, and to a fair trial by an impartial jury occurred
when the State's lead investigator and representative at trial directly vouched for
Jordyn's truthfulness specifically regarding her accusations against Webster.
Alternatively, trial counsel's failure to object to the improper testimony constitutes
ineffective assistance of counsel.

ASSIGNMENT OF ERROR IV:  Plain error in violation of Webster's rights to due
process, to confront the State's evidence, and to a fair trial by an impartial jury occurred
when the State's lead investigator and representative at trial testified that the Jordyn's
allegations constitute "unlawful sexual conduct with a minor" in violation of Ohio law.
Alternatively, trial counsel's failure to object to the improper testimony constitutes
ineffective assistance of counsel.

ASSIGNMENT OF ERROR V:  Improper application of the rape shield law deprived
Webster of his right to confront the State's evidence and to present a defense when the
court barred the defense from presenting: (1) evidence to which, by the rape shield
statute's plain wording, the shield does not apply; and (2) evidence crucial to the
outcome-determinative timing and mens rea elements of the case, such that even if the
rape shield typically applied, application in the instant case runs contrary to Webster's
Sixth and Fourteenth Amendment rights to due process, confront the State's evidence,
and present a defense.  Alternatively, the trial court abused its discretion in violation of
Webster's same constitutional rights when it denied the motion to sever the GSI charge

6

(the only charge to which the rape shield attached) from the remaining six counts.

ASSIGNMENT OF ERROR VI:  In violation of Webster's rights to due process, to present a defense, and confront the State's evidence, the trial court improperly interpreted the hearsay exception "statements against interest" to exclude statements from Webster which were against his pecuniary and proprietary interest at the time of utterance, but which had become beneficial by the time of trial.  Alternatively, trial counsel provided ineffective assistance of counsel by failing to proffer the correct interpretation of the hearsay exception.

ASSIGNMENT OF ERROR VII:  Alternatively to Assignments of Error I and II, trial counsel provided ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments when counsel: (1) failed to object to a leading question asked of the complaining witness regarding the timing of sexual conduct; and (2) improperly attached a timeframe to the occurrence of sexual conduct during cross-examination of the same witness when she had never testified to said timeframe absent improper leading.  Without these failures, the record would be devoid of any evidence to establish the November 2009 count of unlawful sexual conduct with a minor.

ASSIGNMENT OF ERROR VIII:  Webster's convictions are against the manifest weight of evidence in violation of his Fifth, Sixth, and Fourteenth Amendment rights, as the record lacks specific credible evidence to substantiate the occurrence of four distinct instances of sexual conduct in 2009.

ASSIGNMENT OF ERROR IX:  The cumulative effect of the errors in total, and in various combinations, warrants reversal because each error addresses the same case-determinative issues regarding the timing of sexual conduct, Webster's mens rea regarding Jordyn's age, and Jordyn's credibility.

ASSIGNMENT OF ERROR X:  Plain error resulted when the court ordered Webster to pay, as part of his sentence, restitution to compensate for Jordyn's counseling expenses.

ASSIGNMENT OF ERROR XI:  The trial court abused its discretion in violation of Webster's Sixth, Eighth, and Fourteenth Amendment rights to due process and to be free from cruel and unusual punishment, by sentencing Webster to the maximum fine ($40,000) and a total of 12 years imprisonment comprised of consecutive terms when: (1) comparable cases involving first time offenders convicted of more egregious unlawful sexual conduct have resulted in shorter imprisonment terms or even probation; and (2) the evidence adduced at trial fails to support four distinct incidents of the offense.  Accordingly, the court's factual determinations purporting to assign levels of egregiousness to the different counts and to justify consecutive sentences are arbitrary and unreasonable.

(Doc. 11, Ex. 15).  On September 25, 2013, the Ohio Appeals Court found that there was

insufficient evidence to support petitioner's conviction on count seven of the indictment,

charging petitioner with unlawful sexual conduct with a minor occurring in December 2009.

(Doc. 11, Ex. 18, 19). However, the appeals court affirmed the trial court's judgment in all other

respects.

On November 21, 2013, petitioner was resentenced to a total aggregate prison sentence of

ten years in the Ohio Department of Corrections. (Doc. 11, Ex. 24).

## Ohio Supreme Court

Petitioner, through counsel, filed a timely notice of appeal to the Ohio Supreme Court.

(Doc. 11, Ex. 20). In his memorandum in support of jurisdiction, petitioner raised the following

sixteen propositions of law:

1. Evidence of a single incident of sexual conduct anchored to the requisite timeframe (prior to the complainant reaching the age of consent), coupled with vague assertions that a "pattern of sexual conduct" occurred, constitutes insufficient evidence of multiple counts of Unlawful Sexual Conduct with a Minor in violation of a defendant's rights to due process, a fair trial by an impartial jury, notice of the charges, to present a defense, to confront the State's evidence, and to be free from cruel and unusual punishment.

2. An Indictment and Bill of Particulars for multiple counts of "Unlawful Sexual Conduct with a Minor" fails to adequately notice a defendant of the charges when the facts alleged fail to distinguish specific incidents of sexual conduct anchored to the timeframe prior to the complainant reaching the age of consent.

3. Testimony from the State's detective/trial representative, in a he-said/she-said case stating: (1) that he believes the complainant's allegations against the defendant; (2) that he discovered evidence in corroboration of said accusations; and (3) that the allegations constitute "unlawful sexual conduct with a minor" "in violation of Ohio law"— unconstitutionally infringes on the jury's role of making factual and credibility determinations by vouching for the complainant's truthfulness and by opining an ultimate legal conclusion concerning the defendant's *mens rea*.

4. Testimony from the State's detective/trial representative, in a he-said/she-said case stating: (1) that he believes the complainant's allegations against the defendant; (2) that he discovered evidence in corroboration of said accusations; and (3) that the allegations constitute "unlawful sexual conduct with a minor" "in violation of Ohio law"— constitutes improper vouching for the complainant in violation of the

defendant's rights to due process, to confront the State's evidence, and to a fair trial by an impartial jury.

5. Testimony from the State's detective/trial representative which: (1) uses terms of art that have definitions specific to this offense separate and apart from common vernacular; and (2) concerns ultimate issues—unconstitutionally infringes on the jury's role of making factual and credibility determinations.

6. Ineffective assistance of counsel attaches when, in a he-said/she-said case, counsel fails to object to improper testimony from the State's detective/trial representative which: (1) directly vouches for the truthfulness of the complainant regarding her allegations against the defendant; (2) represents that he discovered evidence in corroboration of said accusations; and (3) concludes that the allegations constitute "unlawful sexual conduct with a minor" "in violation of Ohio law."

7. The State waives its ability to use the rape shield statute to bar the defendant from presenting evidence on a topic otherwise excludable by the rape shield when the State opens the door to said evidence by asking its own witness about the same topic during its direct examination of the witness.

8. Evidence typically excludable per the rape shield statute is admissible when necessary to protect a defendant's constitutional rights to present a defense and confront the State's evidence regarding essential elements of the offense.

9. If, while conducting relevance and probative-value-versus-prejudice analyses, the trial court applies a strict liability *mens rea* to "unlawful sexual conduct with a minor"—an offense that actually carries a knowingly or reckless *mens rea*—and the court ultimately precludes the defendant from presenting the evidence in question, the trial court's consideration of the wrong *mens rea* violates a defendant's constitutional rights to due process, to present a defense, and to confront the State's evidence when the evidence in question would have impacted the sufficiency, weight, and credibility of State's evidence of the timing of the sexual conduct and the defendant's *mens rea* by demonstrating that the sexual conduct occurred after the alleged victim turned 16 years old/the age of consent.

10. Trial counsel's failure to properly proffer evidence constitutes ineffective assistance of counsel when the evidence in question would have impacted the sufficiency, weight, and credibility of [the] State's evidence of the timing of the sexual conduct and the defendant's *mens rea* by demonstrating that the sexual conduct occurred after the alleged victim turned 16 years old/the age of lawful consent.

11. A "statement against interest" must be analyzed from the perspective of when the statements were made rather from the perspective of the time of trial, even if the statements have become helpful to the defendant by the time of trial.

12. Improper interpretation of an evidentiary rule which leads to the exclusion of evidence crucial to an outcome-determinative timing element of the offense runs contrary to a defendant's rights to due process, to present a defense, and to confront the State's evidence.

13. Ineffective assistance of counsel attaches when trial counsel fails to proffer the proper interpretation of an evidentiary rule and the improperly excluded evidence pertains to a crucial, outcome-determinative timing element of the offense in question.

14. Plain error and ineffective assistance of counsel attaches when trial counsel fails to object to an improper leading question that establishes the only evidence to potentially substantiate one of the counts of the crime at issue; and then leads the witness to repeat the same testimony during cross-examination.

15. Plain error attaches to a restitution order that includes compensation for a victim's psychiatric treatment when the restitution order is part of the sentence (as opposed to a condition of probation).

16. Factual determinations purporting to assign levels of egregiousness to different counts in order to justify non-minimum, consecutive prison terms and maximum fines are arbitrary and unreasonable when a defendant is indigent, a first time offender, and the record lacks specific evidence to support three distinct counts.

(Doc. 11, Ex. 21).  On February 19, 2014, the Ohio Supreme Court declined to accept jurisdiction of the appeal.  (Doc. 11, Ex. 24).

## Federal Habeas Corpus

Petitioner, through counsel, filed the instant federal habeas corpus action raising the following nine grounds for relief:

**GROUND ONE**:
In finding that the state presented sufficient evidence to prove Webster guilty beyond a reasonable doubt of three separate counts of unlawful sexual conduct with a minor, the state courts unreasonably determined the facts in a number of ways and ruled contrary to or unreasonably applied clearly established Supreme Court precedent concerning Webster's constitutional rights to due process, a fair trial, and to have the State prove his guilt beyond a reasonable doubt.

A. Because the jury acquitted Webster of the June 2009 babysitting-payment incident, of the remaining counts, the record is only able to support one count— the Chloe Kelly incident.

**GROUND TWO**:
In finding that the state charged and proved three separate counts of unlawful sexual conduct with a minor with sufficient specificity, the state courts unreasonably determined the facts in a number of ways and ruled contrary to or unreasonably applied clearly established Supreme Court precedent concerning Webster's constitutional rights to due process, notice of the specific charges against him, to present a defense, to confront the state's evidence, to have the state prove his guilt beyond a reasonable doubt in a jury trial, and to protected against double jeopardy and cruel and unusual punishment.

**GROUND THREE:**
The state courts unreasonably determined the facts and ruled contrary to or unreasonably applied clearly established Supreme Court precedent regarding Webster's constitutional rights to due process, to confront the state's evidence, to have a fair trial by an impartial jury, and to have the state prove his guilt beyond a reasonable doubt, in finding that the state's lead investigator and representative at trial did not impermissibly vouch for the complaining witness's truthfulness regarding her accusations against Webster. Likewise, the state courts unreasonably determined the facts and ruled contrary to or unreasonably applied clearly established Supreme Court precedent regarding these same constitutional rights in finding that Webster opened the door to such testimony from the complaining witness and that the case did not hinge on the complaining witness's credibility and truthfulness regarding the charges.

**GROUND FOUR:**
The state courts unreasonably determined the facts and ruled contrary to or unreasonably applied clearly established Supreme Court precedent regarding Webster's constitutional rights to due process, to confront the state's evidence, and to have a fair trial wherein an impartial jury determines whether the evidence presented proves beyond a reasonable doubt all the essential elements of the crime, when it determined that the state's lead investigator and representative at trial did not vouch for the complaining witness or infringe on the jury's duty by testifying about ultimate issues in the case—that Jordyn's allegations constitute "unlawful sexual conduct with a minor" "in violation of Ohio law." Likewise, the state courts unreasonably determined the facts and ruled contrary to or unreasonably applied clearly established Supreme Court precedent regarding these same constitutional rights in finding that the testimony in question merely established the background and fairness of the detective's investigation, and that the case did not hinge on the complaining witness's credibility and truthfulness regarding the charges.

A. Pitchford's testimony failed to account for the mens rea element of "unlawful sexual conduct with a minor."

B. Pitchford's testimony contained impermissible legal conclusions pertaining to terms that have specialized meanings within the statute defining the offense in question.

**GROUND FIVE:**
The state courts unreasonably determined the facts and ruled contrary to or unreasonably applied Supreme Court precedent concerning Webster's constitutional rights to present a defense and confront the state's evidence by improperly applying the rape shield law and barring the defense from presenting: (1) evidence to which, by the rape shield statute's plain wording, the shield does not apply; and (2) evidence crucial to the outcome-determinative timing and mens rea elements of the case, such that even if the rape shield typically applied, application in the instant case runs contrary to Webster's Sixth and Fourteenth Amendment rights to due process, confront the State's evidence, and present a defense.

A. The excluded evidence should have been admitted based on two independent grounds: (1) proper interpretation of the state evidentiary rules; and (2) proper weighing of the relevance and probative value in connection with Webster's constitutional rights.

    1. Admissibility based on proper interpretation of the state evidentiary rules. Although Webster's claims are based on his constitutional rights under the U.S. Constitution and Supreme Court precedent, Webster includes this discussion to demonstrate additional unreasonable factual determinations by the state courts.

        a. The rape shield does not apply to false sexual allegations or the origin of disease. Thus, the rape shield was inapplicable to: (1) the false allegations that Jordyn had sexual relationships with other professional football players; (2) testimony that Jordyn transmitted a sexually transmitted disease to Redman and Bud; and (3) the timing when Webster transmitted this same disease to his wife Jennifer.

        b. The State waived rape shield protection of testimony from Redman and Bud (adult men who lived in Webster's house) concerning their sexual encounters with Jordyn during the relevant timeframe of June 2009 through Summer 2010, and the transmission of a sexually transmitted disease from Jordyn to both men.

    2. Admissibility based on constitutional considerations. Even if this Court finds that the rape shield applies to the proffered evidence, enforcing the rape shield in this case violated Webster's Sixth and Fourteenth Amendment rights to confront the State's evidence and present a defense. The highly probative value of such evidence concerning central issues in the case outweighs any prejudice to the State.

**GROUND SIX:**
The state courts unreasonably determined the facts and ruled contrary to or unreasonably applied Supreme Court precedent concerning Webster's

constitutional rights to due process, to present a defense, and to confront the state's evidence when it improperly interpreted the hearsay exception "statements against interest" to exclude statements from Webster which were against his pecuniary and proprietary interest at the time of utterance.

**GROUND SEVEN:**
Alternatively to Grounds for Relief I and II, trial counsel provided ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments when counsel: (1) failed to object to a leading question asked of the complaining witness regarding the timing of sexual conduct; and (2) improperly attached a timeframe to the occurrence of sexual conduct during cross-examination of the same witness when she had never testified to said timeframe absent improper leading. Without these failures, the record would be devoid of any evidence to establish the November 2009 count of unlawful sexual conduct with a minor.

Additionally, trial counsel provided ineffective assistance of counsel when counsel failed to proffer: (1) the evidence the trial court excluded pursuant to the rape shield law and its implications on Webster's constitutional rights; (2) Jennifer Webster's testimony that Webster confessed to having a sexual relationship with Jordyn in 2010 (after she had turned 16); and (3) the proper interpretation of the evidentiary rule in question in Ground for Relief VI along with the constitutional considerations at stake which trump the state evidentiary rule.

Finally, trial counsel provided ineffective assistance of counsel when counsel failed to adequately argue that the state opened the door to Redman and Bud's testimony concerning their sexual relations with Jordyn and the transmission of the STD. The state courts unreasonably determined the facts and ruled contrary to or unreasonably applied Strickland v. Washington in concluding otherwise, or in failing to address Webster's arguments concerning specific instances of ineffective assistance of trial counsel.

**GROUND EIGHT:**
Webster's conviction is against the manifest weight of evidence. The state courts unreasonably determined the facts and ruled contrary to or unreasonably applied clearly established Supreme Court precedent in finding that the jury properly weighed the evidence and resolved conflicts in the evidence such that the State proved Webster guilty of the offenses beyond a reasonable doubt.

**GROUND NINE:**
The state courts unreasonably determined the facts and ruled contrary to or unreasonably applied Supreme Court precedent concerning Webster's constitutional rights to due process, to present a defense, and to confront the state's evidence when it denied Webster's motion to sever the GSI charge from the remaining charges (and then failed to address this issue on appeal).

(Doc. 1).

Respondent has filed a return of writ in opposition to the petition, to which respondent has replied.  (Doc. 12, 15).

### III.  THE PETITION SHOULD BE DENIED.

In this federal habeas case, the applicable standard of review governing the adjudication of constitutional issues raised by petitioner to the state courts is set forth in 28 U.S.C. § 2254(d). Under that provision, a writ of habeas corpus may not issue with respect to any claim adjudicated on the merits by the state courts unless the adjudication either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

"A decision is 'contrary to' clearly established federal law when 'the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Otte v. Houk,* 654 F.3d 594, 599 (6th Cir. 2011) (quoting *Williams v. Taylor,* 529 U.S. 362, 412–13 (2000)).  "A state court's adjudication only results in an 'unreasonable application' of clearly established federal law when 'the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* at 599–600 (quoting *Williams,* 529 U.S. at 413).

The statutory standard, established when the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) was enacted, is a difficult one for habeas petitioners to meet.  *Id.* at 600. As the Sixth Circuit explained in *Otte*:

> Indeed, the Supreme Court has been increasingly vigorous in enforcing AEDPA's standards. *See, e.g., Cullen v. Pinholster,* 563 U.S. 170, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011) (holding that AEDPA limits a federal habeas court to the record before the state court where a claim has been adjudicated on the merits by the state court). It is not enough for us to determine that the state court's determination is *incorrect*; to grant the writ under this clause, we must hold that the state court's determination is *unreasonable*. . . . This is a "substantially higher threshold.". . . To warrant AEDPA deference, a state court's "decision on the merits" does not have to give any explanation for its results, *Harrington v. Richter,* [562] U.S. [86], 131 S.Ct. 770, 784, 178 L.Ed.2d 624 (2011), nor does it need to cite the relevant Supreme Court cases, as long as "neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam).

*Id.* (emphasis in original). The Supreme Court extended its ruling in *Harrington* to hold that when a state court rules against a defendant in an opinion that "addresses some issues but does not expressly address the federal claim in question," the federal habeas court must presume, subject to rebuttal, that the federal claim was "adjudicated on the merits" and thus subject to the "restrictive standard of review" set out in § 2254(d). *See Johnson v. Williams*, 568 U.S. 289, 293 (2013).

Although the standard is difficult to meet, § 2254(d) "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings" and "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington*, 562 U.S. at 102. In other words, to obtain federal habeas relief under that provision, the state prisoner must show that the state court ruling on the claim presented "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

The Supreme Court has made it clear that in assessing the merits of a constitutional claim under § 2254(d), the federal habeas court must apply the Supreme Court precedents that

controlled at the time of the last state-court adjudication on the merits, as opposed to when the

conviction became "final."  *Greene v. Fisher*, 565 U.S. 34, 38 (2011); *cf. Otte*, 654 F.3d at 600

(citing *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003)) (in evaluating the merits of a claim

addressed by the state courts, the federal habeas court must "look to Supreme Court cases

already decided at the time the state court made its decision").  In *Greene*, 132 U.S. at 44, the

Court explained:

> [W]e held last term in *Cullen v. Pinholster*, 563 U.S. 170, 131 S.Ct. 1388, 179
> L.Ed.2d 557 (2011), that review under § 2254(d)(1) is limited to the record that was
> before the state court that adjudicated the prisoner's claim on the merits.  We said
> that the provision's "backward-looking language requires an examination of the
> state-court decision at the time it was made." *Id.*, at 182, 131 S.Ct. at 1398.  The
> reasoning of *Cullen* determines the result here.  As we explained, § 2254(d)(1)
> requires federal courts to "focu[s] on what a state court knew and did," and to
> measure state-court decisions *as of 'the time the state court renders its decision.'*"
> *Id.*, at 182, 131 S.Ct. at 1399 (quoting *Lockyer v. Andrade,* 538 U.S. [at] 71-72 . .
> .; emphasis added).

Decisions by lower courts are relevant "to the extent [they] already reviewed and

interpreted the relevant Supreme Court case law to determine whether a legal principle or right

had been clearly established by the Supreme Court."  *Otte*, 654 F.3d at 600 (quoting *Landrum v.

Mitchell*, 625 F.3d 905, 914 (6th Cir. 2010)).  The writ may issue only if the application of

clearly-established federal law is objectively unreasonable "in light of the holdings, as opposed

to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision."

*McGhee v. Yukins,* 229 F.3d 506, 510 (6th Cir. 2000) (citing *Williams,* 529 U.S. at 412).

### A.  Grounds One, Two, and Eight are without merit.

In Grounds One and Eight, respectively, petitioner contends that his convictions were not

supported by sufficient evidence and were against the manifest weight of the evidence.  In his

second ground for relief, petitioner argues that the state failed to charge in the indictment or

prove at trial specific incidents of sexual conduct to support his convictions or provide him with

adequate notice of the charges brought against him.  For the reasons stated below, petitioner is not entitled to federal habeas relief based upon these grounds for relief.

### i.  *Ground Eight*

As an initial matter, petitioner is not entitled to habeas relief on the basis of his manifest weight of the evidence claim in Ground Eight of the petition.  A "manifest weight of evidence" claim, which is based on a state law concept that is "both quantitatively and qualitatively different" from a constitutional due process sufficiency of evidence standard, *see Tibbs v. Florida,* 457 U.S. 31, 41–47 (1982), and *State v. Thompkins*, 678 N.E.2d 541, 546 (1997), *superseded by state constitutional amendment on other grounds in State v. Smith*, 684 N.E.2d 668 (1997), raises an issue of state law only that is not cognizable in a federal habeas corpus proceeding such as this.  *See* 28 U.S.C. § 2254(a); *Pulley v. Harris,* 465 U.S. 37, 41 (1984).

The Due Process Clause does not provide relief for defendants whose convictions are against the manifest weight of the evidence, but only for those who have been convicted without proof sufficient to allow a rational trier of fact to find guilt beyond a reasonable doubt.  *Walker v. Engle*, 703 F.2d 959, 969 (6th Cir. 1983).  In the context of a claim alleging a violation of due process, "sufficiency of the evidence" refers to the due process requirement that there be enough evidence introduced in favor of the prosecution for a rational trier of fact to find each element of the crime beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

However, under Ohio law, a claim that a verdict was against the manifest weight of the evidence—as opposed to one based upon insufficient evidence—requires the appellate court to act as a "thirteenth juror" and to review the entire record, weigh the evidence, and consider the credibility of witnesses to determine whether "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."

*State v. Martin*, 485 N.E.2d 717, 720 (1st Dist. Ohio 1983); *cf. Tibbs v. Florida*, 457 U.S. 31

(1982). "Since a federal habeas court does not function as an additional state appellate court,

vested with the authority to conduct such an exhaustive review, petitioner's claim that his

convictions were against the manifest weight of the evidence cannot be considered by this

Court." *Mason v. Brunsman*, No. 1:07-cv-1020, 2009 WL 2169035, at *29 (July 16, 2009 S.D.

Ohio ) (Spiegel, J.; Black, M.J.). Accordingly, petitioner is not entitled to habeas relief based on

his manifest weight of the evidence claim raised in Ground Eight.

### ii. Grounds One and Two

With respect to Grounds One and Two, concerning the sufficiency and specificity of the

evidence, the Ohio Court of Appeals was the only state court to issue a reasoned decision

addressing the merits of these issues. Finding insufficient evidence for his conviction related to

the December 2009 charge, the appeals court affirmed his assignment of error with respect to

that count. The court of appeals overruled his assignments of error with respect to his

convictions for the September, October, and November 2009 unlawful sexual conduct with a

minor charges, reasoning in pertinent part as follows:

> **The Specificity and Sufficiency of the State's Case**
>
> {¶ 21} In his first and second assignments of error, Webster claims that the state failed to distinguish specific instances of sexual conduct in its indictment and bill of particulars, and during trial. This lack of specificity, according to Webster, hampered his ability to present a defense in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Webster further claims that the state's lack of specificity during trial necessarily resulted in a failure of proof and that his convictions are therefore not supported by sufficient evidence.
>
> {¶ 22} Webster cites *Valentine v. Kontech*, 395 F.3d 626 (6th Cir. 2005), and *State v. Hemphill*, 8th Dist. Cuyahoga No. 85431, 2005-Ohio-3726, in support of his argument that the state's case lacked the requisite level of specificity to sustain his convictions. Both cases are distinguishable from the present one.

18

*Valentine* and *Hemphill*

{¶ 23} Defendant Michael Valentine was accused of sexually abusing his step-daughter. The state charged him with 20 counts of child rape and 20 counts of felonious sexual penetration of a minor. The state alleged that all of the counts occurred over the same ten-month period. Each rape count in the indictment contained identical language from the Ohio Revised Code, as did each sexual penetration count. The state's bill of particulars alleged that each crime had occurred in the family home. The Sixth Circuit Court of Appeals determined that the fatal flaw in the state's case against Valentine was that, in its indictment and in its evidence presented at trial, "the prosecution did not attempt to lay out the factual bases of forty separate incidents that took place." *Valentine* at 663. The only evidence presented concerning the number of sexual encounters between Valentine and his victim came from the victim herself, who described what a typical abusive encounter consisted of and then estimated the number of time[s] the behavior had occurred. *Id.* at 632–633. The court determined that "[g]iven the way that Valentine was indicted and tried, it would have been incredibly difficult for the jury to consider each count on its own." *Id.* at 633. As a result, Valentine was tried and convicted in an "all or nothing" fashion. *Id.* at 634.

{¶ 24} In *Hemphill*, the defendant has been indicted for 99 sexually oriented offenses. The indictment essentially alleged three types of sexual crimes occurring over varying timeframes. Hemphill was convicted of 22 counts each of rape and gross sexual imposition with sexually violent predator specifications, 7 counts each of rape and gross sexual imposition without specifications, and 29 counts of kidnapping with sexual motivation specifications. Relying on *Valentine*, the Eighth Appellate District held that the state had failed to adequately differentiate these counts and, with three exceptions, failed to subject each count to individual proof. The court found that for the vast majority of the charges, Hemphill had, like Valentine, been convicted based on a generic description of sexual acts combined with a numerical estimate of how many times the act had occurred. *Hemphill* at ¶ 88–92.

{¶ 25} In the present case, the state's indictment and bill of particulars sufficiently differentiated among the counts charged. The state, as is permissible, used the same language in each of its counts of sexual conduct with a minor. But it distinguished the charges by narrowing the time frame of each. And Webster was given notice in the bill of particulars that the state was alleging that vaginal intercourse between Webster and Jackson took place in Webster's home and in his car while his car was parked in parking lots close to his home. Alleging one count a month of sexual conduct with a minor and describing the sexual act and the place where it occurred is a far cry from the indictments in *Hemphill* and *Valentine* that alleged dozens of identical crimes without significantly further distinguishing factors. *See State v. Ferren* 8th Dist. Cuyahoga No. 95094, 2011-Ohio-3382, ¶ 32.

{¶ 26} As to the evidence presented at trial, the state did not try Webster in an "all or nothing" fashion. Unlike the victims in *Hemphill* and *Valentine*, Jackson did not merely generically describe a sexual act and estimate the number of times that the act occurred. Instead, the state presented evidence that tied each count to the relevant time frame through Jackson's testimony, her mother's and father's testimony, Chloe Kelly's testimony, telephone records, and Webster's confession. This allowed Webster the chance to defend against each count. And it allowed the jury to contemplate each count separately.

{¶ 27} We therefore hold that *Valentine* and *Hemphill* are distinguishable from the present case and that Webster's argument has no merit.

**Sufficiency of the Evidence**

{¶ 28} Webster's argument that there was insufficient evidence to sustain his convictions has some merit. Our standard of review when addressing the sufficiency of the evidence is whether, after viewing the evidence presented in the light most favorable to the state, any rational trier of fact could have found all the essential elements of the crime charged beyond a reasonable doubt. *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 29} The crime of unlawful sexual conduct with a minor is defined in R.C. 2907.04(A). That code section states that "[n]o person who is eighteen years of age or older shall engage in sexual conduct with another, who is not the spouse of the offender, when the offender knows the other person is thirteen years of age or older but less than sixteen years of age, or the offender is reckless in that regard."

{¶ 30} As detailed above, Jackson testified that in September 2009, October 2009 and November 2009 she and Webster had engaged in vaginal intercourse. The state tied each charge to the relevant time frame though Jackson's testimony, through the corroborating testimony of Chole Kelly, Michelle and Hue Jackson, and through Webster's confession and cellular telephone records. We hold that this evidence was sufficient and specific enough to sustain Webster's convictions for the charges tied to September, October, and November 2009.

{¶ 31} We do, however, find a lack of proof in regard to the December 2009 charge. The state presented no evidence that any sexual contact occurred between Jackson and Webster during that month. The only evidence presented were phone records showing that contact between Jackson and Webster had continued through December 2009. This was not sufficient to prove a charge under R.C. 2907.04(A). We therefore reverse Webster's conviction for count seven in his indictment that alleged a violation of R.C. 2907.04(A) occurring in December 2009.

(Doc. 11, Ex. 18 at PageID 318–19).

After review of the record in this case, the undersigned finds that petitioner is not entitled to habeas relief based upon his sufficiency of evidence or specificity claims.

The clearly-established standard of review for evaluating the merits of constitutional claims challenging the sufficiency of the evidence was established by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307 (1979). As the Supreme Court held in *Jackson*, because the Due Process Clause requires the State to prove beyond a reasonable doubt every fact necessary to constitute the charged offense, *In Re Winship,* 397 U.S. 358, 363–64 (1970), "the relevant question" in assessing the sufficiency of the evidence "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319 (emphasis in original).

Under the *Jackson* standard, the State is not required to rule out every hypothesis except that of guilt beyond a reasonable doubt. *Id.* at 326. Rather, "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.*; *see also Walker v. Engle,* 703 F.2d 959, 969–70 (6th Cir. 1983). It is the responsibility of the trier of fact to resolve conflicts in testimony, to weigh the evidence and to draw reasonable inferences from the evidence. *Jackson,* 443 U.S. at 319. Consequently, the reviewing court is not permitted to reweigh the evidence, reevaluate the credibility of witnesses, make its own subjective determination of guilt or innocence, or otherwise substitute its opinion for that of the jury. *See id.* at 318–19 & n.13; *see also United States v. Fisher,* 648 F.3d 442, 450 (6th Cir. 2011) (citing *Brown v. Konteh,* 567 F.3d 191, 205 (6th Cir. 2009)); *York v. Tate,* 858 F.2d 322, 329 (6th Cir. 1988) (per curiam).

"Circumstantial evidence alone is sufficient to support a conviction." *Newman v. Metrish,* 543 F.3d 793, 796 (6th Cir. 2008) (quoting *Johnson v. Coyle,* 200 F.3d 987, 992 (6th Cir. 2000)); *see also Fisher*, 648 F.3d at 450.  Due process is satisfied as long as such evidence is enough for a rational trier of fact to make a permissible *inference* of guilt, as opposed to a reasonable *speculation* that the petitioner is guilty of the charged crime.  *Newman,* 543 F.3d at 796–97 (and Sixth Circuit cases cited therein).

Moreover, federal habeas review of a claim challenging the sufficiency of the evidence is even further limited.  As the Sixth Circuit explained in *Brown*, 567 F.3d at 205, the federal habeas court is "bound by two layers of deference to groups who might view facts differently than [the habeas court] would."   The federal habeas court must defer not only to the trier of fact's findings as required by *Jackson*, but under 28 U.S.C. § 2254(d), must also "defer to the *state appellate court's* sufficiency determination as long as it is not unreasonable." *Id.* (emphasis in original); *see also Davis v. Lafler,* 658 F.3d 525, 531 (6th Cir. 2011); *Anderson v. Trombley*, 451 F. App'x 469, 474-75 (6th Cir. 2011).  Therefore, as the Sixth Circuit went on to emphasize in *Brown*:

> [W]e cannot rely simply upon our own personal conceptions of what evidentiary showings would be sufficient to convince us of the petitioner's guilt.  We cannot even inquire whether *any* rational trier of fact would conclude that petitioner . . . is guilty of the offenses for which he was charged.  Instead, we must determine whether the Ohio Court of Appeals itself was unreasonable in *its* conclusion that a rational trier of fact could find [the petitioner] guilty beyond a reasonable doubt based on the evidence introduced at trial.

*Brown,* 567 F.3d at 205 (emphasis in original).

Applying the double-layer deferential standard to the case-at-hand, the undersigned is convinced that the Ohio Court of Appeals' sufficiency determination was not based on an unreasonable determination of the facts and is neither contrary to nor an unreasonable

application of *Jackson*.  As reasonably determined by the Ohio Court of Appeals, the prosecution offered sufficient evidence for each of the three counts of unlawful sexual conduct with a minor for which Webster was convicted.  Under Ohio Rev. Code 2907.04(A), "[n]o person who is eighteen years of age or older shall engage in sexual conduct with another, who is not the spouse of the offender, when the offender knows the other person is thirteen years of age or older but less than sixteen years of age, or the offender is reckless in that regard."

In this case, the victim, Jordyn Jackson, testified that she had sex with petitioner numerous times when she was fifteen years old.[4]  (*See* Doc. 11, Transcript at PageID 1237). Specifically, she testified that in early September petitioner text messaged her while she was at school, picked her up from her friend Chloe Kelly's house after soccer practice, and took her to his house, where they had sex in his bedroom.[5]  (*Id.* at PageID 1047–55).  Jackson testified that petitioner told her he would kill members of her family if she told anyone.  (*Id.* at PageID 1056, 1059-60).  According to Jackson, she had sex with petitioner six or seven more times—either in petitioner's home when his wife was gone or in his car—before the end of October, when she stopped babysitting for petitioner.  (*Id.* at PageID 1058).  According to Jackson, prior to the end of October 2009, they would have sex in petitioner's bedroom, the basement bedroom, or, on one occasion, in petitioner's gold truck.  (*Id.* at PageID 1058, 1101-02).   Jackson testified that during September and October, she would have sex with petitioner while babysitting or after petitioner picked her up from Kelly's house.  (*Id.* at PageID 1059).  She further testified that on October 28, 2009, petitioner told her that he loved her and she marked the occasion on her calendar,

---

[4]  The victim was fifteen until February 2010.  The parties also stipulated as to petitioner being more than ten years older than the victim, as required under 2907.04(B)(3).  (Doc. 11, Trans. at PageID 1421-22, 1694-95, 1828).

[5]  Jackson testified that she played soccer for Loveland High School during this time and the only year she played for Loveland's soccer team was during her sophomore year in 2009.  (*See id.* at PageID 1049, 1116).  Her mother, Michelle Jackson, testified that the soccer season ran from June until the end of October.  (*Id.* at PageID 886).

which was admitted at trial.  (*Id.* at PageID 1076–78).

Jackson testified that her mother caught her in a car with petitioner in October 2009.[6]  (*Id.* at PageID 1060–63).  Despite being grounded following the incident, she testified that she continued to have sex with petitioner in November as frequently as two to three times per week.  (*Id.* at PageID 1063–66, 1199).  Jackson testified that they would arrange a designated spot to meet via text message, she would tell her mother or grandmother that she was going for a run, and she would instead meet petitioner in the designated location—usually the Lodge Retirement Center or Waterford apartments parking lots—where they would have sex in petitioner's car.[7]  (*Id.* at PageID 1066–68).  Jackson further testified that in early November she went with petitioner to a tattoo parlor and got a heart tattoo with an N (petitioner's first initial) in it.  (*Id.* at PageID 1079–82, 1224).  She testified that she later had the tattoo filled in black.  (*Id.* at PageID 1081).  Jackson stated that the relationship continued until December of 2009, when petitioner left town.  (*Id.* at PageID 1083).  She further testified that she resumed her relationship with petitioner in 2010 and it continued until March 2011 when she disclosed the relationship to her parents.  (*Id.* at PageID 1084, 1092–93).

Although "the testimony of the victim alone is constitutionally sufficient to sustain a conviction," *Tucker v. Palmer*, 541 F.3d 652 659 (6th Cir. 2008), as noted by the Ohio Court of Appeals, the state introduced evidence and testimony to corroborate Jackson's testimony.  Regarding phone contacts, the state presented evidence of 450 text and 256 phone calls between

---

[6] As noted below, Michelle and Hue Jackson previously testified that this occurred on October 30, 2009.  (*Id.* at PageID 895, 976-77).

[7] Jackson testified that she had sex with petitioner in the back seat of petitioner's green Ford truck, gold suburban, and black BMW.  (*Id.* at PageID 1067-68, 1100-02).  During his police interview, petitioner also stated that he had sex with the victim in "the BMW and the Excursion and the Suburban."  (Doc. 20 at PageID 2125).

Jackson and petitioner in September, 35 texts and 84 phone calls in October, and 57 texts and 125 phone calls in November.  (*Id.* at PageID 1134–38).  As noted below, petitioner admitted that he used his cell phone to set up sexual encounters with Jackson.

Chloe Kelly testified as to petitioner picking Jackson up from her home in the fall of 2009.  Kelly testified that during that time she learned that petitioner and Jackson were texting each other and that petitioner picked Jackson up from her house on three or four occasions in a black truck.  (*Id.* at PageID 1263, 1267–68).  Although she did not observe petitioner inside the vehicle on each pickup, Kelly testified that she went out to meet petitioner and shook his hand on one such occasion.  (*Id.* at PageID 1268, 1277).  According to Kelly, Jackson initially told her she was babysitting, but Kelly became suspicious when Jackson would only be gone about an hour and would return with wet hair, as though she had recently showered.[8]  (*Id.* at PageID 1266).  Jackson eventually told Kelly that she was having sex with petitioner.  (*Id.* at PageID 1267).  Kelly testified that it appeared to her that petitioner and Jackson had established a sexual relationship prior to the start of school, in late August or September.   (*Id.* at PageID 1283.  *See also id.* at PageID 1272-73).

Although the defense attempted to establish that no babysitting arrangement was in place, Jackson's mother, Michelle Jackson, testified that Jackson babysat for petitioner from June through October 30, 2009, when she found them in a car together.  (*Id.* at PageID 895, 900-04).  Her testimony further corroborated Jackson's testimony regarding the November charges.  Mrs. Jackson testified that in November, her daughter would tell her she was going for a jog and "then observed and watched Jordyn leave the house jogging, and then witnessed, saw [petitioner]'s

---

[8] Jackson testified that after having sex with petitioner she would shower before returning to Kelly's home.  (*Id.* at PageID 1064).

cars or trucks leave the driveway." (*Id*. at PageID 910).  According to Mrs. Jackson, her

daughter would be gone 30 to 40 minutes and did not appear to have been jogging when she

returned.  (*Id.* at PageID 912–13).  Mrs. Jackson stated that she knew this occurred in November

2009, because she would observe Jackson from a second-floor window while she fed her

newborn baby, who came home from the hospital on October 31, 2009.[9]  (*Id.* at PageID 910–11).

       Hue Jackson, the victim's father, testified that he confronted petitioner in mid-June 2009

about petitioner not paying Jackson for babysitting.  (*Id.* at PageID 971-72).  According to Mr.

Jackson, petitioner promised to and ultimately did pay her.  (*Id.* at PageID 972).  He further

testified that after Mrs. Jackson found petitioner in the car with his daughter on October 30,

2009, he called petitioner the following day, asked him if anything was going on between them,

and informed petitioner that his daughter was only fifteen years old.  (*Id.* at PageID 976–81).

Mr. Jackson testified that he was certain of the date of the call because his newborn daughter was

scheduled to come home and  because of his team's football schedule.[10]  (*Id.* at PageID 977).

       Detective Pitchford also provided testimony about the investigation leading to the

criminal charges against petitioner.  According to Pitchford, Jackson's boyfriend from March

2010 to May 2010 called him during his investigation and informed him that Jackson said she

was sexually active with petitioner prior to their relationship.  (*Id.* at PageID 1397–98).

Although petitioner and the victim indicated that text messages were used to set up their

meetings, Pitchford testified that from January 2010 to April 2010, there were no phone contacts

between petitioner and Jackson.  (*Id.* at PageID 1398-99.  *See also* 1137-38).  According to

---

[9] The victim testified that her mother called her on one such occasion, stating "I just saw [petitioner] pull out of his
drive way, where are you?"  (*Id.* at PageID 1067).

[10] In closing arguments the prosecution drew the jury's attention to the phone records to pinpoint the date of the call,
noting that the phone records reveal just under a seven minute phone call between Mr. Jackson and petitioner on that
day.  (*Id.* at PageID 1734-35).

Pitchford, Jackson's boyfriend also informed him that Jackson had a tattoo of three hearts, stating "[Jackson] told me they involved [petitioner] and that she got them with him, but she never told me what they meant."  (*Id.* at PageID 1400–1401).

Finally, the prosecution produced a July 21, 2011 taped interview with petitioner, during which petitioner admitted to the sexual relationship and provided evidence corroborating the victim's allegations as to the timing and manner of the relationship.  (*See* Doc. 20).  Although petitioner initially denied the victim's allegations against him, after being confronted with the phone records and a taped conversation between petitioner and the victim, petitioner admitted that he had sex with the victim "a lot of times." [11]  (*Id.* at PageID 2114).  Petitioner stated that this included three times at the Waterford Apartments parking lot, two times at the Lodge retirement center parking lot, and a couple times at his home.  (*Id.* at PageID 2114-15).  Petitioner indicated that at the beginning of the relationship they had sex at petitioner's home.  (*Id.* at PageID 2119; *infra* n.12).  Consistent with the victim's testimony at trial, petitioner also

---

[11] After petitioner was made aware of the phone records and taped conversation petitioner admitted that "[e]verything is true" but the allegation that he used force against the victim (*Id.* at PageID 2114).  Later in the interview petitioner again acknowledged that the victim was being truthful about specific portions of her allegations:

> Detective:  . . . I understand what you are saying but you will agree that part of what she's saying is true. She is telling the truth when she's says she's been having sexual intercourse with you.
>
> Petitioner:  Yes.
>
> Detective:  Right?
>
> Petitioner:  That part is true.
>
> Detective:  Since she's been 15 that's all true.
>
> Petitioner:  That part.
>
> Detective:  And it is true when you say you loved her or lover her you did say it.
>
> Petitioner:  Yes.

(Doc. 20 at PageID 2125-26).

admitted that he used his cell phone to arrange meetings with the victim and that he would pick her up when she was jogging before having sex in the car.  (*Id.* at PageID 2115, 2117-18). Petitioner further acknowledged that the victim babysat for his family at least on a couple occasions (*Id.* at PageID 2089, 2116) and recalled Mr. Jackson confronting him about his daughter.  As noted by the Ohio Court of Appeals, petitioner implied that he had been sexually involved with her at that time.  (*See id.* at PageID 2117).  Petitioner also recalled the victim telling him she was pregnant in 2009, noting that he was having unprotected sex with her at that time.[12]  (*Id.* at PageID 2119).  At several times during the interview petitioner affirmed that the relationship began in 2009.[13]

With respect to petitioner's knowledge of the victim's age, petitioner's comments during the interview provided ample evidence for a reasonable juror to determine, at a minimum, that

---

[12] At trial the victim testified that she falsely told petitioner she was pregnant in 2009.  (Doc. 11, Trans. at PageID 1211).  According to the victim, she did so in an effort to end the relationship, noting that petitioner told her "if [she] was ever pregnant that, one, [she] would have to deal with it [herself] and he would leave [her] alone."  (*Id.*).

[13] During the July 2011 interview petitioner affirmed that the relationship began "a couple years ago" and continued from the summer of 2009 through 2010.  (Doc. 20 at PageID 2116.  *See also id.* at PageID 2118-19).  The interview also included the following exchange:

| | |
|---|---|
| Petitioner: | Yes. She told me she was pregnant one time. |
| Pitchford: | When was that?  Was that a couple years ago when all this first started? |
| Petitioner: | Yes.  And that was (unintelligible). |
| Pitchford: | What year was that?  If this is 2011, what year did she tell you she was pregnant?  Two years ago.  Would that be 2009? |
| Petitioner: | Yeah. |
| Pitchford: | And you had unprotected sex with her then. |
| Petitioner: | Yes.  She was coming in the house, officer, early in the morning. |

(*Id.* at PageID 2119).

petitioner was reckless with regard to the victim's age.[14]  When asked how old he believed the victim was the first time they had sex, petitioner stated "I couldn't tell you honestly.  I couldn't tell you."[15]  (*Id.* at PageID 2120).  Later in the interview petitioner stated "Uhh 15. 14. 16. Whatever age it was."  (*Id.* at PageID 2124).  Petitioner indicated that he knew he was doing something "wrong" during the course of their relationship, noting "I'm having sex with a minor with a . . . an underage girl."  (*Id.* at PageID 2119, 2120).  Petitioner stated that they met in the park and had sex in the car because he recognized things could go bad for him.  (*Id.*).  He further stated that he sought to keep the relationship secret, noting that it was "breaking the law. . . .  Me being 30.  Her being whatever age she was at the time."  (*Id.* at PageID 2124).  Petitioner stated that he "dreaded this day," noting "I knew.  Every time I had sex with her I said man this is going to come bite me in the ass."  (*Id.* at PageID 2130-31).  Finally, as noted by the Ohio Court of Appeals, toward the end of the interview petitioner stated he was willing to "take a fall" for having sex with a minor.[16]  (*Id.* at PageID 2127).

As he did at trial and on appeal, petitioner argues that the confession is ambiguous and the result of detective Pitchford feeding petitioner the time frames, petitioner's inability to properly reference time frames, and Pitchford's failure to explain that unlawful sex with a minor in Ohio includes sex with individuals under 16, rather than 18 as in Florida, petitioner's home state.  Petitioner further argues that Jackson's testimony was inconsistent and that the evidence at

---

[14] As noted above, Mr. Jackson testified that he informed petitioner that the victim was 15 in October 2009.

[15] Petitioner initially guessed that the victim was 17 or 18 at the time of the July 21, 2011 interview.  (*Id.* at PageID 2083).

[16] The prosecution also presented a recording of a conversation between petitioner and the victim, during which petitioner discussed watching the victim grow up and her age.  As recounted by the State during closing, "And then, of course, there are the multiple recordings that you listened to between Jordyn and the defendant in May of 2011, where the defendant states:  You're down the street from me, 10 years, eight years old, I've watched you grow into a - - you're cool.  You was digging an old man.  You like the old man.  Now I'm the old man."  (*See id.* at PageID 1718-19) ("And, again, Nate Webster, page 82:  You think you're grown?  And how old are you now?")).

trial strongly suggests that their sexual relationship was in 2010, not in 2009 based on arguments that he raised during trial and on appeal.  (*See* Doc. 1 at PageID 33-44. *See also* Doc. 11, Ex. 15 at PageID 197-205).  Although petitioner reasserts these claims in his petition, it is not the province of this Court to reweigh the evidence on habeas review.  *See Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003) (noting that a habeas court "does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor has been observed by the trial court").[17]

When viewing all of the evidence in the light most favorable to the prosecution, this Court concludes that the evidence was constitutionally sufficient to sustain petitioner's convictions.  As the Ohio Court of Appeals reasonably determined, the prosecution offered sufficient evidence for a rational trier of fact to find that petitioner had sex with Jackson in each of September, October, and November of 2009 and knew that she was under the age of sixteen or was reckless with respect to her age.   The Ohio Court of Appeals' adjudication of petitioner's sufficiency-of-evidence claims involved a reasonable application of the *Jackson* standard and was based on a reasonable determination of the facts in light of the evidence presented at trial. Petitioner is therefore not entitled to habeas relief based upon Ground One of the petition.

Petitioner has also failed to demonstrate that he is entitled to federal habeas relief based on Ground Two of the petition.  Petitioner claims that the prosecution failed to distinguish specific incidents of each of the charges of unlawful sexual conduct with a minor.  On this basis, petitioner contends he was deprived of proper notice of the charges against him and tried on a pattern of conduct against which he could not defend.  As he did on appeal, petitioner cites to

---

[17] After observing the evidence presented at trial, the trial court judge stated "there was overwhelming evidence through the text messages and other evidence that she was 15 when he started having sex with the child victim." (Doc. 11, Trans. at PageID 1918–19).

*Valentine v. Konteh*, 395 F.3d 626 (6th Cir. 2005) and *State v. Hemphill*, No. 85432, 2005 WL 1706995, at 1 (Oh. Ct. App. July 21, 2005) in support of his claim.

As previously discussed, the Ohio Court of Appeals reasonably distinguished petitioner's case from *Valentine* and *Hemphill*. In *Valentine*, the defendant was charged with twenty counts each of child rape and felonious sexual penetration of his step-daughter, all alleged to have occurred within a ten-month period in their home. The Sixth Circuit determined that Valentine's due process right to sufficient notice was violated because "no factual distinctions were made among any of the forty counts" in the indictment or through evidence introduced at trial, including locations within the home or specific conduct. *Valentine*, 395 F.3d at 633–34. The only evidence offered at trial was the victim's description of typical abusive behavior and an estimate of how many times the abuse occurred.[18] Similarly, in *Hemphill*, the defendant was charged with ninety-nine sexually oriented offenses. The Ohio Court of Appeals found that, like the defendant in *Valentine*, Hemphill's multiple convictions rested on a "numerical estimate which is unconnected to individual, distinguishable incidents." *Hemphill*, 2005 WL 1706995 at *9.

Unlike *Valentine* and *Hemphill*, petitioner was not tried on or convicted of a pattern of abuse or in an all or nothing manner. Although the victim testified that she had sex with petitioner many times prior to turning sixteen, petitioner was not charged with an offense for each incident, nor were the charges based on a numerical estimate by the victim. With respect to the charges of unlawful sex with a minor, the indictment and bill of particulars permissibly

---

[18] In that regard, the Sixth Circuit found that "[t]he jury could only have found him 'not guilty' of some of the counts only if they reached the conclusion that the child victim had overestimated the number of abusive acts." *Id.* at 633. In contrast, in this case, petitioner was able to successfully defend against and was acquitted of the August 2009 charge of unlawful sexual conduct with a minor, as well as the charges of gross sexual imposition and sexual battery. Further, he successfully defended against the December 2009 charge on appeal. (*See* Doc. 11, Ex. 18 at PageID 318-19).

specified five different one-month time periods during which each offense was alleged to have occurred[19] and the victim, conduct, and location of each offense.  (Doc. 11, Ex. 1, 2).  *See Valentine,* 395 F.3d at 637 ("differentiation [between counts] will often require reference to date ranges or time ranges or certain locations or certain actions.  But, differentiation does not require overly-burdensome precision").  *See also Meriweather v. Burton*, No. 15-1126, 2015 WL 7450068, at *2 (6th Cir. Nov. 24, 2015) (noting that while "[t]he Due Process Clause requires a state to give a criminal defendant fair notice of the charges against him, so that the defendant may prepare a defense. . . . when child sex-abuse victims are involved, a detailed timeframe is not required").  Through the indictment, bill of particulars, testimony of the victim, and other evidence presented at trial, petitioner was provided with fair notice of the conduct and circumstances underlying each count.[20]  Specifically, petitioner was charged with having vaginal intercourse with the victim (who he knew was less than sixteen or was reckless in that regard) in his home or in vehicles parked near his home—at the Waterford Apartment and Lodge Retirement Home parking lots—in September, October, and November 2009.  Through the victim's testimony and supporting evidence, the prosecution distinguished each count and established that petitioner had sex with the victim in September in his bedroom after picking the victim up from Chloe Kelly's home; in his car and home in October either while babysitting or

---

[19] With respect to the time frame for the charged conduct, the *Valetine* Court further noted that "[t]his Court and numerous others have found that fairly large time windows in the context of child abuse prosecutions are not in conflict with constitutional notice requirements."  *Valentine*, 395 F.3d at PageID 632 (collecting cases).  *See also Bruce v. Welch*, No. 13-346, 2014 WL 3360686, at *5 (6th Cir. July 10, 2014) (finding constitutionally adequate notice was provided where the indictment charged sexual abuse over a four-year timeframe).

[20] Regarding  the dates specified in the bill of particulars and petitioner's ability to prepare a defense, trial counsel commented as follows:

> [T]he defense used the Bill of Particulars to prepare our defense.  They state with particularity when these offenses occurred and we prepared our defense based on the Bill of Particulars prepared by the prosecution.

(Doc. 11, Trans. at PageID 462).

picking the victim up from the Kelly home; and in his car in November while the victim was out

of the home jogging.  Furthermore, as detailed above and contrary to petitioner's claims, the

prosecution presented specific evidence to benchmark each count to the charged timeframe and

otherwise presented sufficient to support his convictions and sentence.[21]  Accordingly, the Ohio

Court of Appeals properly distinguished *Valentine* and *Hemphill* from petitioner's case and

reasonably determined that his claim was without merit.[22]

      In any event, in this habeas corpus action, the Court may only grant federal habeas if the

state court decision unreasonably applied United States Supreme Court precedent.  "[C]ircuit

precedent does not constitute clearly established Federal law, as determined by the Supreme

Court . . . [i]t therefore cannot form the basis for habeas relief under AEDPA." *Parker v.*

*Matthews*, 567 U.S. 37, 48–49 (2012) (internal citation and quotation marks omitted).  As such,

the Sixth Circuit—relying on the Supreme Court's decision in *Renico v. Lett*, 559 U.S. 766

(2010)—has indicated that its decision in *Valentine* does not serve as a basis for federal habeas

relief:

> The *Valentine* court based its legal reasoning on Supreme Court cases applicable to
> federal indictments, *Russell*, 369 U.S. at 763–64, 82 S.Ct. 1038; *Hamling*, 418 U.S.
> at 117–18, 94 S.Ct. 2887, and a few circuit cases, including *Isaac v. Grider*, 211
> F.3d 1269, 2000 WL 571959, at *4 (6th Cir. 2000), *DeVonish v. Keane*, 19 F.3d

---

[21]  With respect to petitioner's claim that the State failed to establish separate distinct events tied to charged timeframe, the undersigned notes that the prosecution's case included petitioner's police interview statements that he had sex with the victim several times at his home, three times at the Waterford Apartment parking lot, and two times at the Lodge Retirement Center parking lot.  (Doc. 20 at PageID 2114-15).  Petitioner's admission that he used his cell phone to coordinate his encounters with the victim and the corresponding cell phone records for September, October, and November 2009, as well as the testimony of the victim and corroborating witnesses detailed above, provided sufficient evidence to establish the separate, distinct events giving rise to his convictions and sentence.

[22] Petitioner also contends the lack of specificity violated his constitutional rights against double jeopardy and cruel and unusual punishment.  (*See* Doc. 1 at PageID 33-44; Doc. 15 at PageID 2044-2056).  Having determined that petitioner was provided with constitutionally sufficient notice of the charges against him and sufficient evidence was introduced at trial to substantiate his convictions, the Court finds that petitioner was not  subjected to double jeopardy by being punished multiple times for the same conduct as petitioner argues.  (*See* Doc. 1 at PageID 34, n.2). Petitioner's claim that his resulting sentence amounts to cruel and unusual punishment (for allegedly being imprisoned for sexual relations with the victim when she was older than 16) is equally unavailing in light of the substantial evidence supporting his convictions.

107, 108 (2d Cir. 1994), *Fawcett v. Bablitch*, 962 F.2d 617, 618–19 (7th Cir. 1992), and *Parks v. Hargett*, 188 F.3d 519, 1999 WL 157431, at *3 (10th Cir. 1999). Two of those cases, *DeVonish* and *Fawcett*, were decided before AEDPA was enacted in 1996, while *Isaac* and *Parks*—and *Valentine* itself—were decided before the Supreme Court issued *Renico* in 2010. In light of *Renico's* admonition that "clearly established Federal law" means relevant Supreme Court precedent and not circuit court opinions, *see Renico*, 559 U.S. at 778–79, 130 S.Ct. 1855, and because "no Supreme Court case has ever found the use of identically worded and factually indistinguishable [state] indictments unconstitutional," *Valentine*, 395 F.3d at 639 (Gilman, J., dissenting), we doubt our authority to rely on our own prior decision—*Valentine*—to "independently authorize habeas relief under AEDPA." *Renico*, 559 U.S. at 779, 130 S.Ct. 1855. Rather, Coles must point to a Supreme Court case that would mandate habeas relief in his favor. He has not done so, and consequently, he has not demonstrated that the decision of the Ohio Court of Appeals rejecting his Sixth Amendment claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Renico*, 559 U.S. at 779, 130 S.Ct. 1855.

*Coles v. Smith*, 577 F. App'x 502, 507–08 (6th Cir. 2014). *See also, e.g., Wampler v. Haviland*, No. 3:17-cv-2136, 2018 WL 6249681, at* 16 (N.D. Ohio Nov. 29, 2018) (distinguishing *Valentine* and noting that *Valentine* "does not provide the necessary precedent to obtain habeas relief in federal court."). Because petitioner is not entitled to federal habeas relief based on circuit court precedent and has otherwise failed to demonstrate that the Ohio Court of Appeals' decision was based on an unreasonable determination of the facts or contrary to or an unreasonable application of Supreme Court precedent, petitioner is not entitled to federal habeas relief based on Ground Two of the petition.

Accordingly, petitioner is not entitled to federal habeas relief based upon Grounds One, Two, or Eight of the petition.

### B. Ground Three is without merit.[23]

In Ground Three, petitioner contends that Detective Pitchford impermissibly vouched for the victim and that the Ohio courts unreasonably determined that petitioner opened the door to such testimony. Petitioner further contends that defense counsel was ineffective for failing to object to Pitchford's testimony, which petitioner maintains violated his constitutional rights. (*See* Doc. 1 at PageID 45).

Petitioner raised Ground Three as an assignment of error on direct appeal. The Ohio Court of Appeals overruled the assignment of error, reasoning as follows:

**Testimony About Jackson's Credibility**

{¶33} In his third assignment of error, Webster claims that plain error occurred when detective Pitchford offered his opinion as to Jackson's credibility. Webster alternatively argues that counsel was ineffective for failing to object to this testimony.

{¶34} Webster takes issue with the following exchange between the assistant prosecuting attorney and Pitchford during re-direct examination:

Q. Now, Detective, Ms. Donovan [defense attorney] asked you whether you believed Miss. Jackson.

A. Yes.

Q. And do you believe that she was having sexual intercourse with Nate Webster when she was 16 years old?

A. Yes.

Q. And do you believe that she was having sexual intercourse with him when she was 15 years old?

A. Yes.

---

[23] As with Ground Four of the petition, discussed below, petitioner did not object to error alleged in Ground Three of the petition at trial and petitioner argued it amounted to plain error on direct appeal. However, unlike Ground Four of the petition, the Ohio Court of Appeals decision does not specifically state that it reviewed the claim under Ohio Crim. R. 52(B). (*See* Doc. 11, Ex. 18 at PageID 319–22). Accordingly, although it appears petitioner committed the same procedural default as discussed in Ground Four below, the undersigned will review petitioner's third ground for relief on the merits.

Q. And do you believe possibly she was even having sexual intercourse shortly after she turned 17 years old in February 2011?

A. Yes.

{¶35} Citing *State v. Boston*, 46 Ohio St.3d 108, 545 N.E.2d 1220 (1989), Webster claims that Pitchford's testimony deprived him of a fair trial and that his convictions must be reversed. In *Boston*, the Court held that "[a]n expert may not testify as to the expert's opinion of the veracity of the statements of a child declarant." *Id.* at syllabus.

{¶36} *Boston* is not directly on point since Pitchford was not testifying as an expert. However, in *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 122, the Ohio Supreme Court ruled that a police officer's opinion that an accused is being untruthful is inadmissible.

{¶37} If we were to review the cited exchange in a vacuum, based on *Davis* Webster's argument might have merit. Webster, however, opened the door to this testimony and we find no error.

{¶38} On cross-examination, defense counsel asked Pitchford numerous questions concerning Jackson's credibility as it related to the pending charges. Counsel asked Pitchford (1) whether he believed Jackson when she told him that she had babysat for the Websters numerous times (Webster's and Jackson's relationship allegedly started when Jackson started babysitting), (2) whether Jackson's story concerning her first sexual encounter with Webster "made any sense" to Pitchford, (3) whether Pitchford was aware that Jackson's father had called Jackson a "liar" when she first told him of her sexual relationship with Webster, (4) whether Pitchford believed one of two conflicting stories Jackson had told concerning whether her mother or Webster had gone with her to purchase a new cellular telephone that enabled her to stay in contact with Webster, and (5) whether Pitchford was aware that Jackson's former boyfriend thought that Jackson had been lying about some of her allegations against Webster.

{¶39} Unlike in *Davis* and *Boston*, where the state had offered testimony concerning the victim's truthfulness during its case-in-chief, here the state was rebutting the defendant's attempt to establish that Jackson had lied about multiple aspects of the pending charges. It is well-settled that a prosecutor can respond to issues raised by an accused. *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 101; *see State v. Kelly*, 9th Dist. Summit No. 24660, 2011-Ohio-4999; *State v. Irwin*, 7th Dist., Columbiana No. 11-CO-6, 2012 Ohio 2704, ¶ 22.

{¶40} In sum, a defendant cannot fairly expect the state to ignore a line of attack on a victim's veracity as it relates to the pending charges. The prosecution was well within its bounds to ask questions that directly countered the defendant's

36

stringent cross-examination of Pitchford. We therefore hold that no error occurred. And since there was no error, counsel was not ineffective for failing to object. *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). Webster's third assignment of error is overruled.

(Doc. 11, Ex. 18 at PageID 319–22).

As observed by the Ohio appeals court, it is improper for a prosecutor or detective to express a personal belief on the credibility of a witness. *See United States v. Young*, 470 U.S. 1, 9–10 (1985). *See also Dorsey v. Banks*, 749 F.Supp.2d 715, 755–59 (S.D. Ohio 2010) (applying prosecutorial misconduct analysis set forth in *Darden*, *infra*, to a claim of vouching by law enforcement). The Supreme Court in *Young* articulated two dangers posed by such comments: "such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *Young*, 470 U.S. at 18–19.

However, a petitioner is not entitled to federal habeas corpus relief based on a prosecutorial misconduct claim unless the improper comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo,* 416 U.S. 637, 642-43 (1974); *see also Darden v. Wainwright,* 477 U.S. 168, 181 (1986) ("it is not enough that the prosecutor's remarks were undesirable or even universally condemned[;]" rather, the "relevant question" is whether the prosecutor's challenged conduct rendered the trial fundamentally unfair in violation of due process). *Cf. Ross v. Pineda*, 549 F. App'x 444, 452–53 (6th Cir. 2013) (noting that "this Court is unlikely to find that a prosecutor's

statement that he or she *personally* believes the victims to be sufficiently flagrant to warrant reversal") (quotation makes omitted).  "The *Darden* standard is a very general one, leaving courts 'more . . . leeway in reaching outcomes in case-by-case determinations.'"  *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  The alleged misconduct must be examined within the context of the  entire trial to determine whether it deprived the defendant of a fair trial.  *Young,*  470 U.S. at 11–12.  Under the "invited response" rule, for example, where the alleged error was invited by the defense's own conduct, "the remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error.  In other words, the Court must consider the probable effect the  prosecutor's response would have on the jury's ability to judge the evidence fairly."  *Id.* at PageID 10.[24]

The Sixth Circuit previously set forth a two-step inquiry to determine whether a prosecutorial misconduct rises to the level of a constitutional violation, requiring the conduct to be both improper and flagrant.  Four factors were evaluated to determine whether improper conduct was flagrant: (1) the likelihood that the remarks would mislead the jury or prejudice the accused, (2) whether the remarks were isolated or extensive, (3) whether the remarks were deliberately or accidentally presented to the jury, and (4) whether the other evidence against the defendant was substantial.   *See Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000).  However, in *Parker v. Matthews*, the Supreme Court observed that "[t]he highly generalized standard for evaluating claims of prosecutorial misconduct set forth in *Darden* bears scant resemblance to the elaborate, multistep test employed by the Sixth Circuit."  *Parker,* 567 U.S. at 49.  The *Parker*

---

[24] In *Young* the Supreme Court directed that "the reviewing court must not only weigh the impact of the prosecutor's remarks, but must also take into account the defense counsel's opening salvo.  Thus the import of the evaluation has been that if the prosecutor's remarks were 'invited,' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction."  *Young*, 470 U.S. at 14.

Court held that it was error for the Sixth Circuit to rely on its own precedents in granting habeas relief and reaffirmed that the *Darden* standard governs claims of prosecutorial misconduct in federal habeas corpus.

In this case, petitioner has failed to demonstrate that the Ohio Court of Appeals' decision was based on an unreasonable determination of the facts or was contrary to or an unreasonable application of Supreme Court precedent. Petitioner contends that the Ohio Court of Appeals unreasonably determined that the defense opened the door to Pitchford's testimony through its cross-examination. However, as noted by the Ohio appeals court, prior to the contested testimony the defense questioned Pitchford extensively about the victim's credibility as it related to her allegations against petitioner, specifically inquiring whether Pitchford believed multiple portions of her testimony. Defense counsel asked Pitchford, "Do you believe her when she said [that she babysat for the Websters on multiple occasions]?" and, with respect to her testimony that petitioner picked her up from Chloe's house after school, whether "her testimony make[s] any sense to you?" (Doc. 11, Trans. at PageID 1350, 1357). Defense counsel further confronted Pitchford on apparent discrepancies in her testimony, inquiring "which do you think is true?" or "which do you believe?"[25] (*Id.* at PageID 1361, 1371). Finally, prior to the contested testimony on re-direct, defense counsel herself elicited the following exchange with respect to Jackson's allegation that she continued to have sex with petitioner despite being grounded and prohibited from going outside without her parents:

> Q.     And yet, Jordyn says she continued to go outside and have sex with Nate
>        Webster, correct?

---

[25] Specifically, the defense asked Pitchford whether he believed Jackson's interview statements that she told Kelly that her mom was picking her up from the Kelly home or—as Kelly testified—that it was petitioner picking her up. Pitchford testified that "I believe Chloe Kelly was telling the truth. And I believe [Jackson] wasn't telling Chloe the truth . . . ." (*Id.* at PageID 1361). The defense also asked Pitchford whether he believed Jackson's 2011 statement that she went with her parents to get a new phone or her trial testimony that petitioner took her to get a new phone. (*Id.* at PageID 1371–72). Pitchford responded "I don't know on that one." (*Id.* at PageID 1372).

A.     Yes.

Q.     So did her parents go with her, since she said she wasn't even allowed to walk outside without them being there?

A.     Okay.  Well, are you asking the question to me?

Q.     Yeah, umm-hmm?

A.     If we've all had teenagers and we ground our teenagers, as we all probably did, we snuck out of the house.  And I believe Jordyn disobeyed her parents and went down to that man's house, and had sex with him at his home, got in his vehicles, went to the parks, went to the lodge, went to the Waterford Apartments, that's exactly what she did.

Q.     And if she were 16 at the time that she did all those things, it is not criminal; is it, Detective?

A.     No.

(*Id.* at PageID 1368-69).

Upon review of the record, the undersigned finds that the Ohio appeals court reasonably determined that Pitchford's testimony on redirect was in response to the defense's line of questioning regarding whether Pitchford believed Jackson's testimony.  Accordingly, the Ohio Court of Appeals' adjudication of petitioner's claim was not based on an unreasonable determination of the facts.

The decision was likewise not contrary to or an unreasonable application of Supreme Court precedent.  As noted above, the relevant question under *Darden* is whether Pitchford's testimony "so infected the trial with unfairness to make the resulting conviction a denial of due process."  *Darden*, 477 U.S. at 181.  Petitioner has made no such showing in this case.  As argued by respondent, the dangers typically associated with improper vouching were not implicated in this case.  First, Pitchford's testimony did not convey to the jury the impression that his belief in Jackson's credibility was based on outside evidence not presented to the jury.

40

*See Young*, 470 U.S. at 18–19.  To the contrary, and as discussed below regarding Ground Four of the petition, the prosecution's direct-examination of Pitchford detailed his investigation of the case to demonstrate that Pitchford did not coach Jackson and otherwise conducted a fair investigation.  In doing so, Pitchford testified as to the specific evidence that he relied on in assessing Jackson's credibility, including the phone records between her and petitioner, Jackson's calendar, her ability to identify tattoos on petitioner's body, and recorded statements made by petitioner.  (Doc. 11, Trans. at PageID 1306–1308, 1319).

Second, as to the concern that the jury may be induced to trust Pitchford's judgment rather than its own view of the evidence, *Young* 470 U.S. at 18–19, the jury was instructed that it was the exclusive judge of the credibility of witnesses:

> The jury is the also the exclusive judge of the credibility or believability of the witnesses and the weight to be given to evidence.  You may disbelieve all or any part of the testimony of any witness.

(Doc. 11, Trans. at PageID 1826).  *See also Greer v. Miller*, 483 U.S. 756, 767 n.8 (1987) (the jury is presumed to follow the directions of the trial court judge absent "an overwhelming probability" that the jury would be unable to do so and "a strong likelihood that the effect of the evidence would be devastating to the defense") (internal citations and quotation marks omitted); *Shaieb v. Burghuis*, 499 F.App'x 486, 499 (6th Cir. 2012) (same).  Accordingly, any prejudice stemming from Pitchford's comment was negated by the trial court's curative instruction.  *See Donnelly*, 416 U.S. at 644 (stressing curative instruction issued by trial court that arguments of attorneys were not evidence and holding petitioner was not deprived of fair trial); *United States v. Warshak*, 631 F.3d 266, 306  (6th Cir. 2010) (any prejudice caused by prosecutor's comments was either extinguished entirely or diminished drastically by curative instructions that closing arguments were not evidence and to disregard personal opinions of counsel); *United States v.*

41

*Roberts*, 986 F.2d 1026, 1031 (6th Cir. 1993) ("the prejudicial effect of improper comments may be negated by curative instructions to the jury").

Finally, the weight of the evidence presented in support of petitioner's convictions and sentence also reduced the likelihood that the jury was influenced by Pitchford's comments.  *See Darden*, 477 U.S. at 181.  Petitioner maintains that the trial amounted to a he said/she said case.[26] However, as noted above, petitioner confessed to the sexual relationship, as well as to using his cell phone to arrange meetings with the victim.  Through the phone records establishing phone contacts between petitioner in September, October, and November of 2009, the victim's testimony detailing their sexual relationship while she was fifteen, as well as the corroborating testimony of Chole Kelly, Mr. Jackson, and Mrs. Jackson, the prosecution provided substantial evidence of petitioner's guilt.

Accordingly, in sum, petitioner has failed to demonstrate that the Ohio Court of Appeals' decision was based upon an unreasonable determination of the facts or was an unreasonable application of Supreme Court precedent.  Because petitioner has failed to demonstrate that the decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *Harrington*, 562 U.S. at 103, petitioner is not entitled to federal habeas relief based on his improper vouching

---

[26] In Grounds Three and Four of the petition, petitioner claims that because none of the corroborating witnesses bore witness to sexual conduct between petitioner and the victim, their testimony is entirely dependent on the victim's truthfulness/credibility.  Petitioner further claims that without the victim's testimony the phone records are meaningless.  On this basis petitioner argues that the Ohio Court of Appeals' decision rejecting petitioner's claims that Pitchford's and the victim's testimony established the entire case against him and the State's entire case depended on the victim's truthfulness was based on an unreasonable determination of the facts.  (*See* Doc. 1 at PageID 50-53, 57).  However, petitioner's claim that the phone records were meaningless absent the victim's testimony fails to account for petitioner's police statements indicating that he used his cell phone to arrange their meetings.  Additionally, the corroborating witnesses testified as to their independent observations, which served to establish the timeframe for the charged conduct as well as petitioner's knowledge of or recklessness with regard to the victim's age.  These witnesses' observations—such as Chloe Kelly's testimony that petitioner picked her up from her home in September and October of 2009, Mrs. Jackson's testimony that she observed petitioner's cars and trucks leave his driveway after her daughter left for jogs in November, and Mr. Jackson's testimony that he informed petitioner that his daughter was 15 in October 2009—are independent from the credibility of the victim or her testimony.

claim in Ground Three of the petition.  Furthermore, because petitioner's vouching claim is
without merit, the Ohio Court of Appeals reasonably determined that trial counsel was not
ineffective for failing to raise the meritless objection during trial.  *United States v. Martin*, 45 F.
App'x 378, 381–82 (6th Cir. 2002) ("Failure of trial counsel to raise wholly meritless claims
cannot be ineffective assistance of counsel.").

## C.  Ground Four is procedurally defaulted and waived.

In Ground Four, petitioner claims that Pitchford testified as to the ultimate issue in the
case: that the victim's allegations constitute unlawful sexual conduct with a minor in violation of
Ohio law.  (Doc. 1 at PageID 53-61).  Petitioner claims the alleged error amounted to a violation
of his due process rights and that trial counsel was ineffective for failing to object to these issues
at trial.

Petitioner raised Ground Four as an assignment of error on direct appeal.  The Ohio
appeals court reviewed the alleged error under plain error analysis review and overruled the
assignment of error.  Furthermore, because the underlying alleged error was itself without merit,
the court of appeals reasoned that trial counsel was not ineffective for failing to object to the
testimony at trial:

### Alleged "Ultimate Issue" and "Specialized Meaning" Testimony

{¶41} In his fourth assignment of error, Webster claims that plain error occurred
when Pitchford improperly "asserted his own conclusions" to the jury that
Jackson's allegations against Webster constituted the crime of unlawful sexual
conduct with a minor.  Because there was no objection to this testimony, we review
for plain error.  Crim.R. 52(B).  Plain error does not exist unless, "but for the error,
the outcome of the trial clearly would have been otherwise."  *State v. Long*, 53 Ohio
St.2d 91, 372 N.E.2d 804 (1982), paragraph two of the syllabus.  Notice of plain
error "is to be taken with the utmost caution, under exceptional circumstances and
only to prevent a manifest miscarriage of justice."  *Id.* at paragraph three of the
syllabus.  In the alternative, Webster contends that counsel was ineffective for
failing to object.

43

{¶42} Pitchford was in the midst of explaining to the jury how he became involved in this case when the following exchange occurred between the assistant prosecuting attorney and Pitchford:

Q.  When you interviewed all the people [Hue, Michelle, and Jordyn Jackson] and you determined, I think you told the jury that what she said in terms of the unlawful sex with a minor did violate Ohio law?

A.  Yes.

{¶43} Based on this exchange, Webster asserts that Pitchford actually testified (1) that sexual intercourse occurred between Jackson and Webster when Jackson was 15 years old, and (2) that Webster had been reckless in regard to Jackson's age. This, according to Webster, violated his "Fifth, Sixth, and Fourteenth Amendment rights to due process, to confront the State's evidence, and [to] a fair trial wherein an impartial jury determines whether the evidence presented proves beyond a reasonable doubt all the essential elements of the crime."  Webster also claims that Pitchford's testimony contained "impermissible legal conclusions pertaining to terms that have specialized meanings within the statute defining the offense in question."  *See U.S. v. Nixon*, 694 F.3d 623 (6th Cir. 2012).

{¶44} We are not convinced that Webster's characterization of the cited question and answer is entirely accurate.  Pitchford testified after Jackson had testified. During defense counsel's cross-examination of Jackson, the defense attempted to establish that the police had coached Jackson in regard to the timing of her relationship with Webster.  The passage cited by Webster was a part of a larger exchange during which the state was attempting to establish that Pitchford's investigation into Webster's case had been fair.  This testimony was proper. *Cassano*, 96 Ohio St.3d at 101, 772 N.E.2d 81.

{¶45} Even if we were to agree with Webster's portrayal of this exchange, we find no grounds for reversal.  Webster claims that the error is plain error because "the combination of Pitchford's and Jordyn's testimony established the entire case against Webster."  In this same argument Webster also claims that "the [s]tate's entire case" rested on Jackson's truthfulness.  Neither statement is accurate.  Chloe Kelly, Hue Jackson, and Michelle Jackson corroborated the timeframes testified to by Jackson.  And in his confession, Webster admitted that he had had sexual intercourse with Jackson, possibly in 2009.  He also admitted that he and Jackson would text each other to arrange meetings.  The state produced telephone records showing contact between Webster's cellular telephone and Jackson's cellular telephone during the months in question.  Further Webster stated in his confession that he didn't know how old Jackson was when they started having sex, stating that she may have been between 14 and 16 years old.

{¶46} Consequently, the state's case was not based solely on Jackson's and/or Pitchford's testimony.  With or without the complained-of statement, the

> prosecution presented more than sufficient evidence to convict Webster of unlawful sexual conduct with a minor. This argument therefore has no merit. And we also find no ineffective assistance of counsel for counsel's failure to object to Pitchford's testimony. *See Strickland*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; *Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373. Webster's fourth assignment of error is overruled.

(Doc. 11, Ex. 18 at PageID 319–24).

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state defendant with federal constitutional claims must fairly present those claims to the state courts for consideration before raising them in a federal habeas corpus action. *See* 28 U.S.C. § 2254(b)(1), (c); *see also Anderson v. Harless,* 459 U.S. 4, 6 (1982) (per curiam); *Picard v. Connor,* 404 U.S. 270, 275-76 (1971). In order to satisfy the fair presentation requirement, the claims asserted in the federal habeas petition must be based on the same facts and same legal theories that were presented to the state courts. *Carter v. Mitchell*, 693 F.3d 555, 568 (6th Cir. 2012) (citing *Williams v. Anderson,* 460 F.3d 789, 806 (6th Cir. 2006); *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998)). Moreover, a claim is deemed fairly presented only if the petitioner presented his constitutional claims for relief to the state's highest court for consideration. *See O'Sullivan v. Boerckel,* 526 U.S. 838, 845, 848 (1999); *Hafley v. Sowders,* 902 F.2d 480, 483 (6th Cir. 1990); *Leroy v. Marshall,* 757 F.2d 94, 97, 99-100 (6th Cir. 1985). If the petitioner fails to fairly present his constitutional claims through the requisite levels of state appellate review to the state's highest court, or commits some other procedural default that prevents a merit-based review of the federal claims by the state's highest court, he may have waived the claims for purposes of federal habeas review. *See O'Sullivan,* 526 U.S. at 847-48; *Harris v. Reed,* 489 U.S. 255, 260-62 (1989); *McBee v. Grant,* 763 F.2d 811, 813 (6th Cir. 1985); *see also Weaver v. Foltz,* 888 F.2d 1097, 1099 (6th Cir. 1989).

It is well-settled under the procedural default doctrine that the federal habeas court may be barred from considering an issue of federal law from a judgment of a state court if the judgment rests on a state-law ground that is both "independent" of the merits of the federal claim and an "adequate" basis for the state court's decision.  *See Harris,* 489 U.S. at 260-62.  The Supreme Court has stated:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default, and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  Such a default may occur if the state prisoner files an untimely appeal, *Coleman*, 501 U.S. at 750, if he fails to present an issue to a state appellate court at his only opportunity to do so, *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994), or if he fails to comply with a state procedural rule that required him to have done something to preserve the issue for appellate review.  *United States v. Frady*, 456 U.S. 152, 167-69 (1982); *Simpson v. Sparkman*, 94 F.3d 199, 202 (6th Cir. 1996).

The Sixth Circuit employs a three-prong test, which was initially established in *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986), to determine if a claim is procedurally defaulted under the adequate and independent state ground doctrine:

> First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule. . . . Second, the court must decide whether the state courts actually enforced the state procedural sanction. . . . Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim.

*Hoffner v. Bradshaw*, 622 F.3d 487, 495 (6th Cir. 2010) (quoting *Jacobs v. Mohr,* 265 F.3d 407, 417 (6th Cir. 2001) (in turn quoting *Maupin*)); *see also Johnson v. Bradshaw*, 493 F. App'x 666,

669 (6th Cir. 2012). Under *Maupin* and as discussed above, if the three prerequisites are met for finding a claim is procedurally defaulted under the adequate and independent state ground doctrine, federal habeas corpus review of the defaulted claim is precluded unless the petitioner can demonstrate cause for and prejudice from his procedural default or that failure to consider the defaulted claim will result in a "fundamental miscarriage of justice." *Hoffner*, 622 F.3d at 495 (citing *Maupin*, 785 F.2d at 138); *Johnson,* 493 F. App'x at 669. *See also Coleman*, 501 U.S. at 750; *Harris,* 489 U.S. at 262; *Murray v. Carrier,* 477 U.S. 478, 485 (1986); *Engle v. Isaac,* 456 U.S. 107, 129 (1982); *Wainwright v. Sykes,* 433 U.S. 72, 87 (1977).

In this case, petitioner procedurally defaulted the claims raised in Ground Four by failing to object to the alleged errors at trial. Ohio's contemporaneous objection rule is a firmly-established, adequate and independent state procedural rule, which serves to foreclose federal habeas review when relied on by the state courts as a basis for denying relief. *See, e.g., Goodwin v. Johnson,* 632 F.3d 301, 315 (6th Cir. 2011) (citing *Hinkle v. Randle,* 271 F.3d 239, 244 (6th Cir. 2001)); *White v. Mitchell,* 431 F.3d 517, 525 (6th Cir. 2005); *see also State v. Murphy*, 747 N.E.2d 765, 788 (Ohio 2001) (noting that Ohio's "waiver rule," which "requires that a party make a contemporaneous objection to alleged trial error in order to preserve that error for appellate review," is "of long standing" and "goes to the heart of the adversary system of justice"). The Sixth Circuit has repeatedly held that "plain error" review by the state appellate court "constitutes enforcement of Ohio's contemporaneous objection rule." *See Williams v. Bagley,* 380 F.3d 932, 968-69 (6th Cir. 2004) (and Sixth Circuit cases cited therein); *see also Goodwin*, 632 F.3d at 315.[27]

---

[27] Petitioner claims that in this instance the contemporaneous objection rule and plain error review is not an adequate and independent bar to review. (*See* Doc. 15 at PageID 2030-33). Petitioner claims that under *Harris v. Reed*, 489 U.S. 255 (1989), a federal habeas court presumes "there is no independent and adequate state ground for a state court decision when the decision fairly appears to rest primarily on federal law, or to be interwoven with federal law, and

The Ohio Court of Appeals clearly enforced the state procedural bar by reviewing petitioner's assignment of error under plain error analysis.  (*See* Doc. 11, Ex. 18 at PageID 322). As such, the state appellate court's plain-error review did not constitute a waiver of the state procedural default rules.  *Seymour v. Weaver*, 224 F.3d 542, 557 (6th Cir. 2000); *see also Goodwin*, 632 F.3d at 315.  The Ohio Supreme Court's later unexplained entry declining to accept jurisdiction of the appeal must be presumed to rely on the same state procedural ground. *See Ylst*, 501 U.S. at 803.  *See also Abshear v. Moore*, 354 F. App'x 964, 970 (6th Cir. 2009); *Knuckles v. Brigano*, 70 F. App'x 830, 840 (6th Cir. 2003).

Therefore, the claims alleged in Ground Four of the petition are barred from review in this proceeding unless petitioner can demonstrate cause for and prejudice from his procedural default or that a fundamental miscarriage of justice will occur if the grounds for relief are not considered on the merits by this Court.  *See, e.g., Coleman,* 501 U.S. at 750; *Harris,* 489 U.S. at

---

when the adequacy and independence of any possible state law ground is not clear from the face of the opinion." (*Id.* at PageID 2024 (citing *Arias v. Lafler*, 511 F. App'x 440, 446) (6th Cir. Jan. 9, 2013))).  However, in this case, nothing indicates that the Ohio Court of Appeals' decision rests on or is somehow intertwined with federal law.  *See Coleman v. Thompson*, 501 U.S. 722, 735 (1991) (noting that a predicate to the application of *Harris* is that the state-court decision must fairly appear to rest primarily on federal law or be interwoven with federal law).  To the contrary, the Ohio appeals court explicitly applied the plain error analysis due to petitioner's failure to object at trial.  As noted above it is well-settled that Ohio's contemporaneous objection rule is a firmly-established, adequate and independent state procedural rule, which serves to foreclose federal habeas review when relied on by the state courts as a basis for denying relief.

Petitioner nevertheless reasons that the state court ruling was not independent of federal law because the analysis under plain error review—whether the outcome of the trial would have been different but for the alleged error—is the same as the analysis for a properly preserved vouching claim, which requires consideration of the prejudicial impact of the challenged comments.  (*Id.* at PageID 2031-32).  In *Knuckles v. Rodgers*, No. 92-3208, 1993 WL 11874, at *3 (6th Cir. Jan. 21, 1993), an unpublished Sixth Circuit case, the court similarly reasoned that because "[t]he basic inquiry in the plain error analysis is whether the defendant has been denied a 'fair trial'" and "[w]hether a person is denied a fair trial is a question to be resolved by applying the principles of federal constitutional law," that the Ohio appellate court's application of plain error was not independent of federal law and did not amount to a procedural default.  However, as noted by the Sixth Circuit, "the *Knuckles* decision has been subject to criticism, and this court has repeatedly held, in published decisions that plain error review by an appellate court constitutes enforcement of Ohio's contemporaneous objection rule."  *Williams v. Bagley*, 380 F.3d 932, 968 (6th Cir. 2004) (rejecting claim that plain error review for failure to contemporaneously object at trial was not independent of federal law).  "State courts do not waive procedural default by reviewing a claim for plain error, even when doing so involves an analysis of federal law."  *Stalling v. Burt*, 772 F. App'x 296, 299 (6th Cir. May 24, 2019) (noting that the Sixth Circuit has repeatedly rejected the argument that the state's reliance on plain error does not amount to a procedural default if it involves an inquiry into federal law) (collecting cases).

262; *Murray,* 477 U.S. at 485.  Although petitioner contends that his trial counsel was ineffective for failing to raise the alleged errors at trial, ineffective assistance of counsel does not constitute cause for his defaults in this case because his ineffective assistance claims are without merit.

To establish ineffective assistance of counsel, petitioner must demonstrate both (1) his trial attorney's conduct was constitutionally deficient; and (2) counsel's deficient performance prejudiced the defense.  *See Strickland v. Washington*, 466 U.S. at 687.  Under the first prong of the *Strickland* test, it must be shown that counsel's representation fell below an objective standard of reasonableness based on all the circumstances surrounding the case.  *Id.* at 688.  In determining whether or not counsel's performance was deficient, the Court must indulge a strong presumption that the challenged conduct fell within the wide range of reasonable professional assistance.  *Id.* at 689.  Under the second "prejudice" prong of the *Strickland* test, petitioner must demonstrate that a "reasonable probability" exists that, but for his counsel's errors, the outcome of the trial would have been different.  *See id.* at 694.  Petitioner has met his burden if he shows that the result of the trial would "reasonably likely have been different absent the errors."  *Id.* at 695.  The Court need not examine the question of whether counsel's performance was deficient before addressing the question of whether petitioner was prejudiced by the challenged conduct. The Court may dispose of an ineffective assistance of counsel claim by finding that petitioner has made an insufficient showing on either ground.  *Id*. at 697.

The undersigned finds that trial counsel was not ineffective for failing to object to the alleged ultimate-issue error underlying petitioner's fourth ground for relief.  As noted above, petitioner contends that Pitchford impermissibly asserted that Jackson's allegations against petitioner constituted the crime of unlawful sexual conduct with a minor.  Specifically, petitioner takes issue with the following statement:

49

Q. When you interviewed all the people and you determined, I think you told the jury that what she said in terms of the unlawful sex with a minor did violate Ohio law?

A. Yes.

(Doc. 11, Trans. at PageID 1300-1301).  Petitioner contends that in so commenting, Pitchford in essence testified that the sexual relationship occurred when Jackson was fifteen, and that petitioner was reckless with regard to her age.  (Doc. 1 at PageID 60-61).  On this basis, he maintains that Pitchford's testimony deprived him of his constitutional rights.

However, the undersigned agrees with the Ohio Court of Appeals' determination that petitioner's claim rests on a mischaracterization of Pitchford's testimony.  As noted by the appeals court, the defense sought to establish that Pitchford coached Jackson with respect to the timeframe of their relationship.  During the cross-examination of Jackson, for example, the defense questioned her about whether or not she was informed by the police that in order for the sexual conduct between her and petitioner to be illegal, she had to be fifteen years at the time. (*Id.* at PageID 1236–37).  In response, the prosecution walked Pitchford through his investigation of Jackson's allegations, including his interview with Jackson and whether he provided any suggestions regarding the timing of her allegations.  Pitchford testified that after receiving Jackson's allegations, he interviewed the victim and her parents separately in order to ensure a fair, impartial, and objective investigation and that he never prompted anyone to say anything. According to Pitchford, the purpose of the interviews was to determine "[t]he details and the particulars about what happened, and how that would then apply to any type of criminal violation."  (*Id.* at PageID 1298–99).  In the challenged exchange, Pitchford testified that after conducting the interviews he determined that the allegations—that Jackson "told us that it occurred in the summer or fall of '09 that she was 15 years of age"—constituted a violation of

Ohio law and he proceeded with the investigation of the case.[28] (*See id.* at PageID 1299, 1301–02). As found by the Ohio appeals court, the challenged testimony was part of a larger line of questioning aimed at demonstrating that Pitchford did not coach Jackson and otherwise conducted a fair investigation. The Ohio Court of Appeals reasonably concluded that Pitchford's testimony did not amount to impermissible ultimate-issue testimony, contain legal conclusions, or otherwise violate petitioner's constitutional rights.

Accordingly, because petitioner's ineffective assistance of counsel claim is without merit, it does not serve as cause for the procedural default of the underlying claims in Ground Four. Furthermore, because petitioner has not otherwise demonstrated that a fundamental miscarriage of justice will occur if his procedurally-defaulted claims for relief are not considered or, in other words, that the alleged errors "probably resulted in the conviction of one who is actually innocent," *see Murray,* 477 U.S. at 495–96. *See also Schlup v. Delo,* 513 U.S. 298, 327 (1995); *Bonilla,* 370 F.3d at 498, petitioner has procedurally defaulted and waived the claims raised in Ground Four of the petition.

### D. Grounds Five & Nine are without merit and/or procedurally defaulted and waived.

In Ground Five, petitioner claims that his constitutional rights were violated based on the trial court's exclusion of evidence under Ohio Rev. Code § 2907.05(E), Ohio's Rape Shield

---

[28] Petitioner contends that Pitchford's comment failed to account for the *mens rea* element for the unlawful sexual conduct with a minor, which required petitioner to have known the victim was under sixteen years of age or have been reckless in that regard. However, as explained above, Pitchford's testimony detailed how he conducted his investigation of the allegations and decided to proceed with the case. The isolated comment was not, as petitioner contends, a proclamation that petitioner was in fact guilty of the resulting charges. To the extent that petitioner contends the *mens rea* element was not demonstrated at trial, the undersigned disagrees. As detailed above, Mr. Jackson testified that he informed petitioner on October 30, 2009 that Jackson was only fifteen and petitioner made several comments during the police interview to demonstrate his knowledge or recklessness, including his comment that Jackson might have been 14, 15, or 16 when they started their sexual relationship.

Statute.[29]  (*See* Doc. 1 at PageID 61-79; Doc. 15 at PageID 2060-2066).  In Ground Nine of the

petition, petitioner also claims his constitutional rights were violated by the trial court's failure to

sever the one count of gross sexual imposition from the remaining charges, which are not subject

to the rape shield.  (Doc. 1 at PageID 91-93).

Prior to trial, petitioner moved to sever the count of gross sexual imposition from the

remaining charges on the basis that the rape-shield protections only applied to this count and

petitioner "intends to introduce evidence as to the victim's sexual activity and claimed sexual

activity." (Doc. 11, Ex. 3 at PageID 149; Doc. 11-12 at PageID 435-36).  The trial court denied

the motion to sever and issued a provisional ruling that evidence of and cross-examination on

prior sexual conduct with other men was precluded on the basis that the prejudicial nature of the

evidence outweighs its relevance.  (*See* Doc. 11-2 at PageID 439, 444).  With respect to prior

false allegations, which the defense argued is not barred by the rape shield, the defense indicated

that it intended to have witnesses testify that the victim made false claims of sexual relationships

with other football players and have the players testify that no such relationships existed.  (*See

id.* at PageID 440-41.  *See also* Doc. 1-1 at PageID 67 n.14;  Doc.11, Ex. 15 at PageID 220 n.15).

The trial court questioned counsel on how the proposed testimony would prove that the victim

was not underage in light of petitioner admitting to the relationship in this case, but ultimately

withheld ruling on the issue.[30]  (*Id.* at PageID 440-42).

---

[29] Under Ohio Rev. Code § 2907.05(E), "Evidence of specific instances of the victim's sexual activity, opinion evidence of the victim's sexual activity, and reputation evidence of the victim's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value."

[30] With regard to the relevance of the prior false allegations, the Court had the following exchange with defense counsel before reserving ruling on the issue:

THE COURT:  So if he already has an admission that's going to come in, how did this talking about having sex with other men have anything to do with it?  Because he got an admission from

The State subsequently filed a motion in limine, seeking to preclude the defense from questioning a witness about specific instances of the victim's sexual activity pursuant to the rape shield.  The motion also sought to exclude evidence related to other acts of the victim under Ohio Evid. R. 608(B), which provides that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness . . . may not be proved by extrinsic evidence."  (*See* Doc. 11, Ex. 6).   The State argued that "evidence of past sexual activity by the victim with other individuals or statements regarding such activity made by the victim are not material to the issue of *when* the acts occurred as the Defendant has already admitted that he engaged in sexual activity with the victim" and the prejudicial nature otherwise outweighed any probative value.  (*Id.* at PageID 158).

During the subsequent hearing, defense counsel stated that the defense did not plan to bring up past sexual activity of the victim.  (Doc. 11-3, Trans. at PageID 466-67).  The trial court granted the motion in part, reserving judgment on the character evidence for trial.[31]   (*Id.* at

---

your client that he had sex with her.

[Defense Counsel]: Well, he had sex with her, but not when she was under age.

THE COURT:  Okay.  So then we'll go to the next step.  How does that tend to prove or disprove that she was under age?

[Defense Counsel]: Because she makes false allegations all the time.

THE COURT: Well, this one evidently is not a false allegation then.

[Defense counsel]:  As to the timing, it certainly is.  She's claiming this happened beginning in June of 2009.  That is an absolute lie.

THE COURT:  Well, that's to be shown.  So I think I'll reserve ruling on that.

(Doc. 11-2, Trans. at PageID 441-42).

[31] The defense stated that although it did not intend to bring up past sexual activity of the victim, it intended to present evidence that the victim was going to petitioner's house not for sex, but "to drink, to smoke, to party."  (*Id.* at PageID 468-69).  While defense counsel stated "those types of activity may peripherally bear on her character," the evidence would be offered to demonstrate that the victim was going to petitioner's house for other purposes than to have sex with petitioner.  In reserving ruling on the matter, the trial court stated "if the defense does bring up relevant character

53

PageID 469-71). Specifically, the trial court found that evidence of the victim's sexual activity was inadmissible under the rape shield statute, but also because it found such evidence not relevant to the charges in the indictment and, in any event, any probative value "is significantly outweighed by the severe prejudice it causes to the victim." (*Id.* at PageID 470).

In the instant action, petitioner contends that the trial court improperly applied the rape shield statute and barred the defense from presenting: (1) evidence that the victim made prior false allegations of sexual relationships with other football players, (2) evidence that she was having sexual relationships with Redman and Bud, petitioner's brothers-in-law, (3) evidence that she infected Redman and Bud with a sexually transmitted disease (STD), and (4) evidence that petitioner infected his wife with the same STD in the summer of 2010. According to petitioner, exclusion of the evidence was improper under the rape shield statute and resulted in violations of his constitutional rights to due process, to confront the State's evidence, and to present a defense. (Doc. 1 at PageID 61-62).

Petitioner raised these claims on direct appeal. (*See* Doc. 11, Ex. 18). The Ohio Court of Appeals overruled petitioner's assignment of error, reasoning as follows:

**The Rape Shield Law**

{¶ 47} In his fifth assignment of error, Webster alleges that the trial court improperly applied R.C. 2907.05(E), the "rape shield law," in his case.

{¶ 48} R.C. 2907.05(E) states:

> Evidence of specific instances of the victim's sexual activity, opinion evidence of the victim's sexual activity, and reputation evidence of the victim's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and

---

evidence I think is admissible, then I will allow it in." (*Id.* at PageID 471).

that its inflammatory or prejudicial nature does not outweigh its probative value.

{¶ 49} Webster claims that the trial court erred when it excluded (1) evidence that Jackson had falsely claimed to have had sexual relationships with other NFL players, (2) evidence that from June 2009 through the summer of 2010, Jackson was having sexual relationships with Redman and Bud, (3) evidence that Jackson infected Redman and Bud with sexually transmitted diseases ("STD"), and (4) evidence that Webster infected his wife with the same STD in the summer of 2010.

{¶ 50} We limit our analysis to Webster's second allegation. There was no proffer to the trial court pertaining to evidence of the spread of an STD. *See State v. Ishmail,* 54 Ohio St.2d 402, 377 N.E.2d 500 (1978), syllabus. And the trial court allowed Jackson to be cross-examined on the issue of whether she had fabricated stories of sexual relationships with other NFL players.

### Application of the Rape Shield Law

{¶ 51} To determine whether the rape shield law was constitutionally applied to exclude evidence that Jackson was having affairs with Redman and Bud, the trial court was required to "balance the state interest which the statute is designed to protect against the probative value of the excluded evidence." *State v. Gardner,* 59 Ohio St.2d 14, 17, 391 N.E.2d 337 (1979).

{¶ 52} At the outset, Webster argues that the trial court's balancing of whether the proffered evidence should have been admitted was flawed because the court applied a "strict liability" mens rea to the crime of unlawful sexual conduct with a minor. Without knowing the elements of the offense, Webster argues, the court could not have properly determined the probative nature of the proffered evidence.

{¶ 53} Webster's representation that the trial court applied an incorrect mens rea when ruling is not supported by the record. First, the court stated that it had read Webster's motion concerning application of the rape shield statute. That motion included the proper elements of unlawful sexual conduct with a minor. Second, at the hearing on this matter, the court listened to arguments that set forth the proper mens rea and then indicated on the record that the crime of unlawful sexual conduct with a minor carried a mens rea of recklessness concerning the age of the victim. In this regard, the court stated, "the burden of proof is reckless. It doesn't have to be knowingly or purposely. It's a lower standard that the state is held to." Finally, while ruling on Webster's motion, the court said, "I don't see how [the proffered evidence] is relevant because it's pretty much a strict liability statute on the age thing, if they prove that she was between 13 and 16 when they had sex *and that he was reckless in that regard*." (Emphasis added.)

{¶ 54} Given the complete context of this sentence and of the hearing overall, we are convinced that the trial court's misstatement that unlawful sexual conduct with

a minor was "pretty much a strict liability statute" was simply that—a misstatement and we find no error.

## Balancing of Interests

{¶ 55} The rape shield law advances several state interests. First, it guards the alleged victim's sexual privacy and protects her or him from undue harassment, thereby discouraging the tendency to try the victim rather than the defendant. *Gardner*, 59 Ohio St.2d at 17, 391 N.E.3d 337. Second, the rape shield law may encourage the reporting of rape, thus aiding crime prevention. *Id*. Third, "by excluding evidence that is unduly inflammatory and prejudicial, while being only marginally probative, the statute is intended to aid in the truth-finding process." *Id*. at 17–18.

{¶ 56} Webster contends that the trial court did not properly weigh the probative nature of the proffered evidence against these state interests. "The key to assessing the probative value of the excluded evidence is its relevancy to the matters as proof of which it is offered." *Id*. at 18. Webster claims the proffered evidence would have explained the multiple phone contacts between his cellular telephone number and Jackson's. We acknowledge that the cellular telephone calls and texts were relevant to the state's case. But evidence of sexual relationships between Jackson and Redman and Jackson and Bud was unnecessary to establish that Jackson had called Webster's telephone number in order to speak to other people. In fact, Redman and Bud both testified at trial that the cellular telephone records admitted by the state reflected contact between each of them and Jackson. Other witnesses for the defense corroborated this testimony. And during his confession to police, Webster stated that Jackson had called his number to speak with either Redman or Bud because she and one of them "had a connection."

{¶ 57} Webster next claims that evidence that Jackson was in sexual relationships with other men would have aided his case in regard to his mens rea. Webster argues that if the jury knew that Jackson was having sexual intercourse with Redman and Bud, who were in their late teens and early twenties, the jury could have inferred that Webster must have thought that Jackson was in her late teens or early twenties. We find this argument to be highly speculative and the evidence of little probative value.

{¶ 58} Overall, we hold that the trial court properly weighed the state interests that the rape shield law protects with the probative value of the proffered evidence.

## Rape Shield Waiver

{¶ 59} Webster next claims that the state waived its rape shield protection during trial. The state asked Jackson during direct examination if she had ever engaged in sexual activity with Redman or Bud. Jackson replied that she had not. Jackson also testified on direct examination that the only person that she had been sexually

involved with in Webster's home was Webster.  Webster now argues that, given this line of questioning, Webster should have been able to question Redman and Bud about this alleged relationship.

{¶ 60} Trial counsel did not raise this exact objection on [sic] at trial.  The defense instead argued that parts of Webster's redacted confession concerning Jackson's alleged relationships should have been played for the jury.  The trial court overruled this objection.

{¶ 61} In regard to the present argument, we hold that there was no plain error given that this evidence was of minimal probative value.  *Long,* 53 Ohio St.3d 91, 372 N.E.2d 804 at paragraphs two and three of the syllabus.

### Severance

{¶ 62}  In his final argument in this assignment of error, Webster claims the trial court abused its discretion when it did not grant his motion to sever the gross sexual imposition count from the remaining charges.  The gross sexual imposition charge is the only charge to which the rape shield law had attached.  Webster cites no case law in support of this argument nor does he cite to alleged error in the record.  It is not this court's job to ferret out the basis for this claim.  App.R. 12; App.R. 16; *Halliday v. Halliday,* 8th Dist. Cuyahoga No. 92116, 2010–Ohio–2597, ¶ 17.

{¶ 63} Webster's fifth assignment of error is overruled.

(Doc. 11, Ex. 18 at PageID 324-29).

Petitioner has not demonstrated that he is entitled to federal habeas relief based on Grounds Five or Nine of the petition.

As an initial matter, petitioner is not entitled to federal habeas relief to the extent that he claims the Ohio courts misapplied Ohio law.  This federal habeas court may review a state prisoner's habeas petition only on the ground that the challenged confinement violates the Constitution, laws or treaties of the United States, and not "on the basis of a perceived error of state law."  28 U.S.C. § 2254(a); *Pulley v. Harris*, 465 U.S. 37, 41 (1984).  *See also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal court to reexamine state-court determinations on state-law questions").  "Errors by a state court in the admission of evidence are not cognizable in habeas corpus proceedings unless they so perniciously affect the

prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994) (citing *Logan v. Marshall*, 680 F.2d 1121, 1123 (6th Cir. 1982)). The Supreme Court has defined the category of infractions that violate "fundamental fairness" very narrowly. *Dowling v. U.S.,* 493 U.S. 342, 352 (1990). "Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker,* 224 F.3d 542, 552 (6th Cir. 2000) (*quoting Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)).

Petitioner in this case claims that the state evidentiary issues resulted in violations of his constitutional rights to confront the witnesses against him and to present a defense. *See Chambers v. Mississippi*, 410 U.S. 284, 294 (1973) (recognizing the right to confront, cross-examine, and call witnesses as essential to due process).

The Sixth Amendment guarantees the criminal defendant the right, applicable to the states by way of the Fourteenth Amendment, "to be confronted with the witnesses against him." U.S. Const. amend. VI; *see also Pointer v. Texas*, 380 U.S. 400 (1965). A "primary interest secured by [the Confrontation Clause] is the right of cross-examination," which "is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 315 (1974) (internal citation and quotation marks omitted); *see also Boggs v. Collins,* 226 F.3d 728, 736 (6th Cir. 2000) (and Supreme Court cases cited therein). However, the right "is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Chambers*, 410 U.S. at 285; *see also Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) ("the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to

whatever extent, the defense might wish") (emphasis in original).  The Supreme Court has stated

that "trial judges retain wide latitude . . . to impose reasonable limits on . . . cross-examination

based on concerns about, among other things, harassment, prejudice, confusion of the issues, . . .

or interrogation that is repetitive or only marginally relevant."  *Delaware v. Van Arsdall*, 475

U.S. 673, 679 (1986).

The Supreme Court has "distinguished between a 'general attack' on the credibility of a

witness—in which the cross-examiner 'intends to afford the jury a basis to infer that the witness'

character is such that he would be less likely than the average trustworthy citizen to be truthful in

his testimony'—and a more particular attack on credibility "directed toward revealing possible

biases, prejudices, or ulterior motives as they may relate directly to issues or personalities in the

case at hand."  *Boggs*, 226 F.3d at 736 (quoting *Davis*, 415 U.S. at 316).  "Under *Davis* and its

progeny, the Sixth Amendment only compels cross-examination if that examination aims to

reveal the motive, bias or prejudice of a witness/accuser" and "does not *require* that a defendant

be given the opportunity to wage a general attack on credibility by pointing to specific instances

of past conduct."  *Id.* at 740.  *See also Jordan v. Warden, Lebanon Corr. Inst.*, 675 F.3d 586, 596

(6th Cir. 2012); *Olson v. Little*, 604 F. App'x 387, 395-96 (6th Cir. 2015).  The Supreme Court

"has never held that the Confrontation Clause entitled a criminal defendant to introduce *extrinsic

evidence* for impeachment purposes."  *Nevada v. Jackson*, 569 U.S. 505, 512 (2013) (emphasis

in original).

The Constitution also guarantees criminal defendants "a meaningful opportunity to

present a complete defense."  *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California

v. Trombetta*, 467 U.S. 479 (1984)).  However, this right is not unlimited, as the Supreme Court

has "recognized that state and federal rulemakers have broad latitude under the Constitution to

establish rules excluding evidence from criminal trials" and only rarely have held "that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." *Nevada*, 569 U.S. at 509 (quotation marks and citation omitted). *See also Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (an accused in a criminal case does not have an unfettered right to offer evidence that is incompetent, privileged, or otherwise inadmissible under the standard rules of evidence); *Rock v. Arkansas,* 483 U.S. 44, 55 (1987) ("[t]he right to present relevant testimony is not without limitation," but rather "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." ) (quoting *Chambers v. Mississippi*, 410 U.S. at 295). "[W]ell-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Holmes v. South Carolina,* 547 U.S. 319, 326 (2006). *See also Crane*, 476 U.S. at 327.

On the other hand, the right to present a complete defense may be compromised "by evidence rules that infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve." *Id.* at 324-25; *United States v. Scheffer*, 523 U.S. 303, 308 (1998). *See also Martin v. Haas,* 731 F. App'x 443, 445 (6th Cir. 2018) ("where evidence is 'not so highly probative' or 'weighty,' we generally do not consider it 'constitutionally guaranteed' and instead defer to a state court's discretion to exclude it") (quoting *Boggs,* 226 F.3d at 745); *Miskel v. Karnes*, 397 F.3d 446, 455 (6th Cir. 2005) (noting that "in each case where 'a weighty interest of the accused' was infringed, the exclusion of evidence seriously undermined 'fundamental elements of the defendant's defense' against the crime charged") (quoting *Scheffer* at 315-17); *Turpin v. Kassulke*, 26 F.3d 1392, 1396 (6th Cir. 1994) ("The Supreme Court looks to several factors in determining whether a defendant's due

process right require the admission of a particular item of evidence," including "the extent to which the proffered evidence is 'critical' in the context of the case" and "'tend[s] to exculpate' the accused.") (quoting *Chambers v. Mississippi*, 410 U.S. 284 (1973)). "[B]ecause a defendant suffers a constitutional violation only if evidence in which the defense has a 'weighty interest' is impermissibly excluded, the arbitrary or disproportionate exclusion of defense evidence has constitutional significance only if the excluded evidence, evaluated in the context of the entire record, creates a reasonable doubt that did not otherwise exist." *Shoemaker v. Jones*, 600 F.App'x 979, 984 (6th Cir. 2015) (internal citation omitted) (quoting *U.S. v. Blackwell*, 459 F.3d 739, 753 (6th Cir. 2006)).

"The United States Supreme Court has never held that rape-shield statutes do not represent a legitimate state interest, nor has it ever held that highly probative evidence will necessarily outweigh that interest." *Gagne v. Booker*, 680 F.3d 493, 516 (6th Cir. 2012). As set forth above, the Ohio Supreme Court has identified the following legitimate state interests advanced by the rape shield law:

> First, by guarding the complainant's sexual privacy and protecting her from undue harassment, the law discourages the tendency in rape cases to try the victim rather than the defendant. In line with this, the law may encourage the reporting of rape, thus aiding crime prevention. Finally, by excluding evidence that is unduly inflammatory and prejudicial, while being only marginally probative, the statute is intended to aid in the truth-finding process.

*State v. Gardner*, 391 N.E.2d 337, 340 (Ohio 1979). *See also Lucas*, 500 U.S. at 149-50 (finding a state rape statute "represents a valid legislative determination that rape victims deserve heightened protection against surprise, harassment, and unnecessary invasions of privacy"); *Jordan,* 675 F.3d at 595 (identifying "the prevention of minitrials on collateral issues, including the victim's history" as an interest to be balanced). In order to determine if a rape-shield rule results in a constitutional violation, the "trial court must balance the state's interest against the

defendant's interest on a case-by-case basis." *Booker*, 680 F.3d at 516 (*citing Michigan v. Lucas*, 500 U.S. 145, 152-53 (1991)). "So long as the trial judge reasonably concludes that the State's interest in exclusion outweighs the defendant's need for the evidence, the Constitution permits the rape shield to do its intended work." *Batey v. Haas*, 573 F.App'x 590, 594 (6th Cir. 2014). *See also Booker*, 680 F.3d at 517 (noting that the pertinent question under AEDPA is not whether the trial judge was correct, but whether the last state court's decision was objectively unreasonable).

In this case, as explained below, petitioner has not demonstrated that the Ohio Court of Appeals' decision was based on an unreasonable determination or that it was contrary to or involved an unreasonable application of Supreme Court precedent.

### Prior Sexual Relations

The Ohio Court of Appeals reasonably concluded that the trial court properly applied the rape shield to preclude evidence that the victim had sexual relationships with petitioner's brothers-in-law, Redman and Bud. Petitioner argued that the evidence of the alleged sexual relationships was relevant to explain the multiple phone contacts between petitioner's phone and the victim, as well as to refute the charge that petitioner was reckless with respect to the victim's age. Observing the state interests advanced by the rape shield law and assessing the probative value of the excluded evidence, the Ohio Court of Appeals concluded that the trial court properly weighed and balanced the competing interests.[32] As noted by the appeals court, evidence of a

---

[32] The undersigned agrees with the Court of Appeals' determination that the trial court's single reference to "strict liability" during the in camera hearing does not indicate that trial court applied the incorrect *mens rea* to the unlawful sexual conduct with a minor charges or that the trial court's balancing of the competing interests was otherwise flawed, as petitioner argues. (*See* Doc. 1 at PageID 62-63). During the hearing, the trial court questioned the relevance of evidence of the victim's prior sexual relations, noting that "I don't see how [the evidence is] relevant, because it's pretty much a strict liability statute on the age thing, if they prove that she was between 13 and 16 when they had sex *and that he was reckless in that regard*." (Doc. 11, Trans. at PageID 439) (emphasis added). In the same comments— both before and after this statement—the trial court correctly identified the *mens rea* as being one of "recklessness." (*See id.* at 438, 439). The trial court also reviewed the indictment and petitioner's motion, which both set forth the

sexual relationship with the brothers-in-law was not necessary to suggest the victim called

petitioner's phone to speak with Redman and Bud. These defendants and others testified that

many people used petitioner's cell phone (*see* Doc. 11-11 at PageID 1508-09, 1537); that

multiple calls reflected in petitioner's phone records were between the brothers-in-law and the

victim concerning drug transactions (*id.* at 1509-13, 1537, 1540); and, in petitioner's police

interview, that the victim "had a connection" with one of the brothers-in-law (Doc. 20 at PageID

2102). On this basis, the defense argued in closing that the phone records were consistent with

drug transactions between the victim and the brothers-in-law. (Doc. 11-11, Trans. at PageID

1744-47). The Ohio Court of Appeals further determined that the victim's alleged sexual

relationships with Redman and Bud (individuals in their late teens and early twenties) was of

little probative value with respect to petitioner's knowledge of or recklessness with respect to the

victim's age. The appeals court reasonably found the argument that the jury could have inferred

that petitioner believed that the victim was also in her late teens or early twenties based on the

alleged relationships to be highly speculative and insufficient to outweigh the State's interests

underlying the rape shield law in this case.

  This Court finds that the trial court reasonably concluded that the State's interest in

exclusion under the rape shield outweighed the defendant's need for the evidence to be included.

*Batey,* 573 F.App'x at 594. The excluded evidence was not critical to the defense, exculpatory,

or highly probative with respect to petitioner's *mens rea* regarding the age of the victim or the

timing of their relationship. Furthermore, in light of the substantial evidence offered in support

of petitioner's convictions, the excluded evidence would not have created a reasonable doubt that

---

correct *mens rea* for the offenses. Upon review of the record, the Ohio Court of Appeals' determination that the trial court's single reference to strict liability was a misstatement and was not an unreasonable determination of the facts, as petitioner suggests. Furthermore, for the reasons stated below, the trial court's comment did not otherwise result in a decision amounting to an unreasonable application of Supreme Court precedent.

did not otherwise exist.[33]  *See Shoemaker,* 600 F. App'x at 984.  Because petitioner has failed to

demonstrate that the application of the rape shield in this case was arbitrary to the purposes of

the statute, *see Garner*, 391 N.E.2d at 340, or that the Ohio Court of Appeals' decision was

otherwise objectively unreasonable, his claim regarding the exclusion of this evidence under the

rape shield law is without merit.  *Booker*, 680 F.3d at 517.[34]

The undersigned's opinion is not altered by petitioner's contention that the State waived

the rape shield protection.  As he did on direct appeal, petitioner argues that because the victim

testified that she never engaged in sexual relations with Redman or Bud, that petitioner should

have been able to question the brothers-in-law about the alleged relationship.  However, as found

by the Ohio Court of Appeals in reviewing the claim for plain error (*see* Doc. 11, Ex. 18 at

PageID 328), petitioner failed to raise this objection at trial and did not attempt to question the

brothers-in-law about relationships with the victim based on the State allegedly opening the door

---

[33] As discussed below, petitioner contends that evidence of STDs allegedly transferred from the victim to the brothers-in-law and petitioner's wife was excluded by virtue of the trial court's rape shield ruling.  Even considering this evidence in conjunction with the excluded evidence of sexual relationships with the brothers-in-law, the Court determines that the evidence would not have created a reasonable doubt that did not otherwise exist and did not otherwise violate petitioner's constitutional rights.

[34] Petitioner cites the Ohio Court of Appeals' decision in *State v. Williams*, 477 N.E.2d 221 (Ohio Ct. App. 1984) in support of his claim that the application of the rape shield at trial was unconstitutional.  As an initial matter, the Court notes that it may only grant habeas relief based on an unreasonable application of Supreme Court precedent.  *See* 28 U.S.C. § 2254(d)(1).  Regardless, *Williams* is distinguishable from the instant case.  In *Williams,* the alleged rape victim testified that because she was a lesbian, she never would have consented to sex with the male defendant.  Noting that in doing so the victim "set[] forth a psychological or biological fact implying the mental or emotional impossibility of consent," which was the only issue contested at trial, the appeals court determined that the exclusion of testimony/evidence of prior sexual relationships with men—evidence that the appeals court determined was "so highly probative, relevant and material as to an element of the crime"—violated the defendant's Sixth Amendment rights and outweighed the State's interests underlying the rape shield law.  *Williams*, 477 N.E.2d at 225, 228.  In contrast, as discussed herein, evidence of relationships with the brothers-in-law in this case was not critical to petitioner's defense or highly probative as to the timing of petitioner's relationship with the victim or of his *mens rea* with respect to her age, nor did the victim's testimony effectively preclude petitioner from defending against an element of the offenses with which he was charged.  As noted by the Ohio Court of Appeals, with respect to petitioner's knowledge of the victim's age, the defense at trial presented witnesses testifying that the victim appeared to be older than fifteen, had been driving at the time, and was admitted to a nightclub after showing identification.  (*See* Doc. 11, Ex. 18 at PageID 316).  Although the jury was not persuaded by petitioner's defense, he was not impermissibly precluded from defending against the charges.  Petitioner's reliance on *Williams* is unavailing.

to such testimony.[35]  By failing to make a contemporaneous objection at trial, petitioner

procedurally defaulted his waiver argument absent a showing of cause and prejudice.  *See White*,

431 F.3d at 525 (finding that plain error review following failure to make a contemporaneous

objection resulted in a procedural default of the underlying claim); *Goodwin*, 632 F.3d at 315

(same).

As cause for the default, petitioner argues that trial counsel was ineffective for failing to

raise the issue at trial.[36]  (*See* Doc. 1, Petition at PageID 73, 84).  Petitioner has failed to

demonstrate cause in this case, however, because he was not prejudiced by counsel's alleged

ineffectiveness.  In other words, petitioner has not demonstrated a reasonable probability that the

outcome of the trial would have been different had trial counsel argued that the rape shield

protection was waived with respect to the brothers-in-laws testimony or if the excluded evidence

had been admitted.  *See Strickland*, 466 U.S. at 694.  As an initial matter, the trial court found

that evidence of an alleged relationship with Redman and Bud was inadmissible only in part

based on the rape shield law. (*See* Doc. 11-3 at PageID 470).  The trial court also determined that

the probative value of the evidence was significantly outweighed by the severe prejudice to the

victim.  *See* Ohio Evid. R. 403(A).  Accordingly, it is not evident that waiver of the rape shield

would impact the trial court's alternate basis for excluding the evidence.  In any event, the

evidence of the alleged relationships with the brothers-in-law was not sufficiently probative to

have altered the outcome of the trial.  With respect to the phone records, petitioner and the victim

---

[35] As noted by the Ohio Court of Appeals, defense counsel did not raise this objection at trial.  Counsel instead argued that petitioner's comments in his police interview alluding to a sexual relationship with the brothers-in-law should not have been redacted when the interview was played for the jury.  (*See* Doc. 11, Trans. at PageID 1290-91).

[36] Arguing that the Ohio Court of Appeals failed to address his ineffective assistance of counsel claims asserted in connection with Ground Five of the petition, petitioner argues that these claims are entitled to *de novo* review.  (*See* Doc. 1 at PageID 73-74).  For the reasons stated below—as to counsel's alleged failure to raise the waiver issue, as well as the STD evidentiary issue discussed next—upon considering the claims *de novo*, the Court finds petitioner's claims without merit.

both admitted to using the phone to meet for sex and the corroborating evidence offered by the prosecution established that this occurred during the time frames specified in the indictment. Whether some of the phone contacts were also with Redman and Bud—for whatever purpose— would not have changed the outcome of the trial. As detailed above, petitioner's recklessness with respect to the victim's age was also amply demonstrated in the police interview and other evidence offered at trial. The Court agrees with the Ohio appeals court that the evidentiary value with respect to petitioner's knowledge of the victim was highly speculative and, therefore, unlikely to change the outcome of the trial. Petitioner has thus failed to demonstrate that he was prejudiced by the alleged ineffective assistance of counsel. Having failed to demonstrate cause for his default and in the absence of a showing that failure to consider the defaulted claim will result in a fundamental miscarriage of justice, petitioner has procedurally defaulted and waived his claim that the rape shield protections were waived.

### Sexually Transmitted Diseases

Petitioner has also procedurally defaulted and waived his claims regarding evidence of the spread of a sexually transmitted disease. Specifically, petitioner claims that he was precluded from presenting evidence that the victim transmitted a sexually transmitted disease to the brothers-in-law and that petitioner transmitted the same disease to his wife in 2010. According to petitioner, this evidence was probative as to the timing of petitioner's relationship with the victim. Although petitioner claims this evidence was proffered in the pretrial in camera hearing and excluded under the rape shield statute (*see* Doc. 1-1 at PageID 61-62, 67), the record in this case includes no discussion or proffer of any evidence of sexually transmitted diseases or, as argued by respondent, any indication that the trial court actually excluded the evidence.[37] Based

---

[37] Even if, as petitioner suggests (*see* Doc. 1 at PageID 67 n.15), the trial court's motion in limine ruling included the admissibility of evidence of STDs, petitioner's failure to proffer the evidence at trial deprived the Ohio Court of

on petitioner's failure to proffer the evidence at trial, the Ohio Court of Appeals did not reach the merits of petitioner's claim. *See Garrett v. Sandusky*, 624 N.E.2d 704 (1994) ("Because the record indicates that the appellant failed to proffer any evidence allegedly excluded by the trial court, [appellant] has waived his right to argue this evidentiary issue on appeal.").

As cause for the default, petitioner contends that trial counsel was ineffective for failing to proffer the evidence at trial. However, the ineffective assistance of trial counsel does not serve as cause in this case because petitioner again fails to demonstrate a reasonable probability that the result of the trial would have been different with the excluded evidence. *See Strickland*, 466 U.S. at 694. Petitioner argues that evidence of a transmission of an STD in 2010 would have supported the defense theory that petitioner and the victim did not have sex until 2010, after the victim turned sixteen. As an initial matter, the Court notes that petitioner's wife did in fact testify that in August of 2010 she suspected that petitioner had been unfaithful, based on personal/health issues that required a trip to the gynecologist.[38] (Doc. 11, Trans. at PageID 1654-66). Regardless, it was not disputed at trial that petitioner had sex with the victim in 2010, as evidence was offered at trial that petitioner continued to have sex with the victim after 2009,

---

Appeals of the ability to address the issue on appeal. *See State v. Grubb*, 503, N.E.2d 142, 147 (Ohio 1986) ("The effect of a granting of a motion *in limine* in favor of the State in a criminal proceeding is to temporarily prohibit the defendant from making reverence to evidence which is the subject of the motion. At trial it is incumbent upon a defendant, who has been temporarily restricted from introducing evidence by virtue of a motion *in limine* to seek the introduction of the evidence by proffer or otherwise in order to enable the court to make a final determination as to its admissibility and to preserve any objection on the record for purposes of appeal."); *State v. Hancock*, 840 N.E.2d 1032, 1044-45 (Ohio 2006) (holding that failure to raise evidentiary issue in a motion in limine hearing or proffer evidence at trial amounts to a failure to preserve the issue for appeal). *See also Ruark v. Warden*, No. 2:12-cv-934, 2014 WL 2217258, at *8-9 (S.D. Ohio May 29, 2014) (finding petitioner's failure to preserve evidentiary issue for appeal following a motion in limine ruling amounted to a procedural default on federal habeas review) (Report and Recommendation), *adopted* 2014 WL 2805096 (S.D. Ohio June 20, 2014); *Carlisle v. Warden*, No. 3:10-cv-289, 2011 WL 4368219, at *3 (S.D. Ohio Sept. 19, 2011) (finding procedural default based on petitioner's failure to proffer evidence following the implied denial of a motion in limine). To the extent that petitioner contends counsel was ineffective for failing to do so, his claim is without merit for the reasons below.

[38] As discussed in Ground Six below, the trial court sustained an objection with respect to petitioner's wife testifying that petitioner subsequently admitted to the relationship. (*Id.* at PageID 1656).

from spring 2010 until March of 2011.  (Doc. 11, Trans. at PageID 858, 1084, 1092-93, 1796).

Evidence regarding the transmission of an STD in 2010 would not preclude petitioner from also

having sexual relations with the victim in 2009, the time period underlying petitioner's

convictions.  In light of the substantial evidence offered by the prosecution in support of the

existence of a sexual relationship in September, October, and November of 2009, petitioner has

not demonstrated a reasonable probability that counsel's failure to proffer evidence of the

transmission of STDs in 2010 would have changed the outcome of the trial.  Therefore, because

petitioner has failed to demonstrate prejudice resulting from the alleged ineffective assistance of

counsel, it does not serve as cause for the default of his claim.  Accordingly, because petitioner

did not proffer evidence of the transmission of sexually transmitted diseases at trial and has

failed to establish cause for the procedural default or otherwise demonstrate that failure to

consider the defaulted claim will result in a fundamental miscarriage of justice, petitioner has

procedurally defaulted and waived this claim for relief.

### Prior False Allegations

Petitioner is also not entitled to federal habeas relief based on his claims concerning

evidence of prior false allegations.  Specifically, petitioner argues that his constitutional rights

were violated by the exclusion of evidence that the victim falsely claimed to have relationships

with other football players. As he did on direct appeal, petitioner contends that such evidence

was relevant to petitioner's *mens rea* regarding the age of the victim and was offered to show

that just as she fabricated relationships with other football players, the victim fabricated when

her relationship began with petitioner.  (*See* Doc. 1-1, Petition at PageID 78).[39]  As discussed

---

[39] Respondent contends that the record fails to demonstrate that the trial court excluded the proposed evidence or that defense counsel even offered it. (*See* Doc. 12 at PageID 1992-93).  Petitioner contends that the evidence was precluded as part of the trial courts motion in limine ruling, which he claims prohibited evidence under Ohio R. Evid. 608(B). (Doc. 15 at PageID 2061 n.11).  The Court need not resolve this dispute, however, because exclusion of the evidence

below (*see infra* n.39), petitioner also posits that the evidence is relevant to demonstrate the victim's "bias and motive for making false claims" or "pattern of claiming to have sexual relationships with professional football players when no such relationship existed." (*Id.* at PageID 68).

      "[F]alse allegations of rape where no sexual activity is involved do not fall within Ohio's rape shield statute. . . . Rather, cross-examination of a rape victim regarding prior false accusations of rape is governed by Ohio Evid. R. 608(B)." *Boggs v. Collins*, 226 F.3d 728, 734 (6th Cir. 2000) (citing *State v. Boggs*, 588 N.E.2d 813, 816 (Ohio 1992)). Rule 608(B) provides in pertinent part that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness, . . . may not be proved by extrinsic evidence." Ohio Evid. R. 608(B). Accordingly, in this context, the Ohio Supreme Court has held that while a trial court may permit cross-examination on prior false allegations, "the defendant will be bound by the answers given by the victim" and "under no circumstances would the defense be permitted to introduce extrinsic evidence." *Boggs*, 588 N.E.2d at 816-17 (prior false allegations "are an entirely collateral matter which may not be proved by extrinsic evidence"). *See also Jordan v. Warden*, 675 F.3d 586, 596 (6th Cir. 2012) ("With respect to a defendant's ability to present extrinsic evidence for impeachment . . . this court has noted that the Supreme Court has not recognized the sweep of the Confrontation Clause 'to encompass the right to impeach an adverse witness by putting on a third-party witness.'") (quoting *Harrington v. Jackson*, 1 F. App'x 367, 370 (6th Cir. 2001)).

      In *Boggs*, the defendant challenged the exclusion of cross-examination and witness testimony as violating his right to confront the witnesses against him and to present a complete

---

did not result in a constitutional violation.

defense.  Specifically, the defendant sought to cross-examine the rape victim about a prior false allegation of rape and introduce two witnesses to testify that the prior accusation was untrue.  *See Boggs*, 226 F.3d at 733.  Regarding the denial of cross-examination as to the prior false allegations, the Sixth Circuit determined that Boggs did not have a constitutional right to cross examine the victim, noting that "[u]nder *Davis* and its progeny, the Sixth Amendment only compels cross-examination if that examination aims to reveal the motive, bias or prejudice of a witness/accuser."  *Id.* at 740.  Finding that the defendant failed to articulate a theory of motive, bias, or prejudice—noting that "at trial and on appeal, Boggs essentially contended that the evidence was crucial because if [the victim] lied or fabricated once, she would do so again"—the Sixth Circuit held that "[n]o matter how central an accuser's credibility is to a case—indeed, her credibility will almost always be the cornerstone of a rape or sexual assault case, even if there is physical evidence—the Constitution does not *require* that a defendant be given the opportunity to wage a general attack on credibility by pointing to individual instances of past conduct."  *Id.* at 740-41.

With respect to the exclusion of the witnesses' testimony, the Sixth Circuit found that exclusion did not implicate Boggs' right to present a defense.  The Sixth Circuit reasoned that based on the other evidence at trial suggesting the victim did not in fact fabricate the attack, the testimony was "not so highly probative of the charges . . . as to be constitutionally required."  *Id.* at 744.  The *Boggs* Court further noted that the relevant rules of evidence (including Ohio R. Evid. 608(B)) were "designed to prevent distracting mini-trials on collateral matters" and that the defendant was otherwise afforded the opportunity to present a full and meaningful defense to the crimes with which he was charged.   *Id.* at 745-46.

In this case, the Ohio Court of Appeals reasonably determined that petitioner's right to

confront the evidence against him was not violated. As noted by the appeals court, petitioner was permitted to cross-examine the victim (*see* Doc. 1-1, Trans. at PageID 1227), as well as her father (*Id.* at PageID 1001), about whether she had falsely claimed to have sexual relationships with the other players. In closing, the defense argued that the victim consistently lied and was generally untrustworthy (*see id.* at PageID 1785-86), specifically arguing that she lied about the prior false allegations. (*Id.* at PageID 1769-70). Although petitioner characterizes the cross-examination as being limited (*see* Doc. 1 at PageID 68), petitioner has not specifically argued, nor does the record reflect, that petitioner's cross-examination of the victim was limited with respect to the prior false allegations.[40] Petitioner contends that the Ohio Court of Appeals improperly equated cross-examination on the issue with petitioner's ability to present affirmative evidence impeaching or contradicting the victim's testimony. (*See* Doc. 1 at PageID 16; Doc. 15 at PageID 2060). However, to the extent that petitioner sought to impeach the victim's testimony through the testimony of third parties, Ohio Evid. R. 608(B) precludes the admission of extrinsic evidence for impeachment. *See Boggs*, 588 N.E.2d at 816-17; *Boggs*, 226 F.3d at 734; *Jordan*, 675 F.3d at 596. The Ohio Court of Appeals' decision finding that petitioner was

---

[40] In any event, as in *Boggs*, any limitation on the cross-examination with regard to the prior false allegations would not implicate petitioner's rights under the Confrontation Clause, as petitioner fails to articulate a theory of bias or prejudice. Despite arguing at trial that the evidence was offered "to show that [the victim] lies all the time" (*see supra* n.29) or, in the instant petition, that just as the victim fabricated relationships with other football players she "fabricated when her sexual relationship with Webster began" (Doc. 1 at PageID 62), petitioner suggests the evidence was not offered merely to impeach the victim's trial testimony or credibility. (*See* Doc. 1 at PageID 77-78 n.18). Instead, petitioner contends that the evidence concerned the victim's "bias and motive for making false claims." (Doc. 1 at PageID 68; Doc. 15 at PageID 2062). However, aside from asserting bias/motive in conclusory terms, petitioner does not articulate how the evidence of prior false allegations are probative of the victim's bias or motive to falsely testify. *See Boggs,* 226 F.3d at 741 ("Simply labeling [a] general credibility argument to be one of 'motive' without articulating a theory of motive or partiality does not implicate the rights carefully outlined in *Davis*."). And petitioner's alleged evidence of "bias and motive" is markedly different than evidence found to be protected under the Confrontation Clause. *See id.* at 740 (distinguishing Supreme Court and circuit court cases which demonstrated a "motive to testify falsely" or "partiality of a witness" from defendant's attack on the victim's credibility); *Lewis v. Wilkinson*, 307 F.3d 413, 420-21 (6th Cir. 2002) (finding excerpts from the victim's diary were probative of motive to bring charges or lie); *Olden v. Kentucky*, 488 U.S. 227, 232 (1988) (cross-examination of alleged rape victim on her relationship with another man was improperly excluded, where the defense sought to show the victim had a motive to lie about her rape allegation to protect that relationship).

not deprived of his rights under the Confrontation Clause is not an unreasonable application of

Supreme Court precedent.  *Nevada*, 569 U.S. at 512 ("This Court has never held that the

Confrontation Clause entitles a criminal defendant to introduce *extrinsic evidence* for

impeachment purposes.") (emphasis in original).  *See also Beverly v. Haas*, No. 16-1902, 2017

WL 6760214, at *3 (6th Cir. 2017) (finding that to the extent that petitioner sought to introduce

evidence of false allegations of sexual assault to generally impeach credibility, the petitioner

failed to demonstrate an incorrect or unreasonable application of Supreme Court precedent);

*Harrington*, 1 F. App'x at 370 (noting that the Supreme Court has not found "the right to

impeach an adverse witness by putting on a third-party witness" to fall within the protections of

the Confrontation Clause).

       To the extent that petitioner claims that the evidence was not offered solely to impeach

the victim's credibility or that he was otherwise deprived of his right to present a complete

defense, his position is equally unavailing.  The fact that the victim may have falsely claimed to

have relationships with others in the past is not probative as to whether petitioner—who admitted

to the relationship with the victim—had sex with the victim in 2009.  *See Boggs*, 588 N.E.2d at

817 ("The mere fact that an alleged rape victim made prior false allegations does not

automatically mean she is fabricating the present charge.").  Petitioner contends that the evidence

of prior false allegations was relevant to petitioner's *mens rea* with respect to the age of the

victim: specifically, that if petitioner believed that the victim were having relationships with

other football players, it would suggest that he believed the victim to be of age to consent to such

activity.  However, there is no indication in the record that petitioner was aware of, much less

that he believed, the prior false allegations.  In any event, as with petitioner's argument

concerning relationships with the brothers-in-law, the connection between the victim making

false prior allegations and petitioner's *mens rea* with respect to the age of the victim is attenuated and speculative. *Cf. Boggs*, 226 F.3d at 744, 45 (noting that testimony regarding a prior false allegation asked "the jury to make a tenuous evidentiary inference" between two distinct incidents in finding the evidence was "not so highly probative to be constitutionally required"). The excluded evidence was of minimal probative value and neither exculpatory nor critical to the defense. As noted above (*see* supra n.33), petitioner was not deprived of his ability to present a defense as to his *mens rea* or any other element of the crimes with which he was charged. Additionally, petitioner has failed to demonstrate that the prior false allegation evidence was excluded in an arbitrary or disproportionate manner. *See Harrington*, 1 F. App'x at 371 ("The Supreme Court has recognized that a state has a legitimate interest in preventing minitrials on collateral issues."). *See also Boggs* at 744. Finally, evaluating the evidence in the context of the entire trial—which included ample evidence to establish petitioner's recklessness—the excluded evidence would not have created a reasonable doubt that did not otherwise exist. *See Shoemaker,* 600 F. App'x at 984. Petitioner is therefore not entitled to federal habeas relief based on his claim regarding the exclusion of evidence of prior false allegations.

### Severance

Finally, in Ground Nine, petitioner challenges the trial court's denial of his motion to sever the charges against him. Prior to trial, petitioner filed a motion to sever the count of gross sexual imposition (GSI) from the remaining counts of unlawful sexual conduct with a minor on the basis that the rape shield only applied to the GSI count. This charged that petitioner compelled the victim to submit to sexual conduct by force or threat of force in an incident alleged to have occurred in June of 2009. (*See* Doc. 11, Ex. 1, 3). Joinder of the charges, petitioner argued, would prevent him from presenting evidence or prior sexual activity barred by

the rape shield.[41]  (*See* Doc. 11-2, Trans. at PageID 436-37; Doc. 11, Ex. 3 at PageID 149).

Petitioner argues that the trial court's failure to sever the charges violated his right to confront

the state's evidence and to present a defense.

     As indicated above, the Ohio Court of Appeals did not consider the merits of issue based

on petitioner's failure to support his claim with any case law or alleged error in the record,

pursuant to Ohio App. R. 12 & 16.  (*See* Doc. 11, Ex. 18 at PageID 329).  It therefore appears

that petitioner procedurally defaulted his severance claim in this federal habeas corpus

proceeding by failing to fairly present the claim to the Ohio courts.  *See Haywood v. Harris*, No.

5:19-cv-1016, 2020 WL13834063, at *13 (N.D. Ohio Nov. 17, 2020) (deferring to the state

court's determination that the petitioner's appellate pleadings did not satisfy Ohio App. R. 12

and 16, in finding the underlying claim procedurally defaulted) (Report and Recommendation),

*adopted* 2021 WL 2433185 (N.D. Ohio Jan 25, 2021); *Johnson v. Bradshaw*, No. 1:03-cv-2509,

2006 WL 2945915, at *9-10 (N.D. Ohio Oct. 13, 2006) (finding Ohio App. R. 16 to be an

"adequate and independent state law basis on which Ohio may rely to preclude federal habeas

review of any federal constitutional claim."); *Banks v. Bradshaw*, No. 1:05-cv-1141, 2008 WL

4356955, at *11 (N.D. Ohio Sept. 17, 2008) (finding Ohio App. R. 12(A) to be an adequate and

independent state rule which bars federal review).[42]

---

[41] As discussed below, although petitioner in this action contends that the rape shield operated to preclude the brother-in-law's testimony, as well as testimony regarding prior false allegations of relationships with other football players and the alleged transfer of an STD in 2010 (*see* Doc. 1-1 at PageID 91, n.23), the rape shield only operated to preclude the first category of evidence.  As argued by petitioner and noted above, the rape shield does not apply to evidence of prior false allegations and the trial court, if it did at all, precluded the evidence under Evid. R. 608(B).  Furthermore, there was no proffer of the transfer of an STD or any indication that such evidence was barred under the rape shield.

[42] Two other potential bases for finding a procedural default of petitioner's waiver claim exist.  First, respondent contends that petitioner committed a different procedural default by failing to raise the claim in the Ohio Supreme Court.  (*See* Doc. 12 at PageID 1996-97).  Although petitioner raised the claim as an assignment of error on direct appeal, respondent contends that petitioner failed to challenge the trial court's decision denying petitioner's motion to sever.  (*See* Doc. 11, Ex. 21 at PageID 342-343).  Petitioner disagrees, pointing to a footnote in his discussion of propositions of law concerning the alleged improperly excluded evidence.  (*See* Doc. 15 at PageID 2042).  Second, petitioner failed to renew his motion to sever at the close of trial.  *See e.g.*, *Kelly v. Warden*, No. 2:19-cv-1984, 2019

In any event, petitioner has not demonstrated that he is entitled to federal habeas relief based on the alleged improper joinder. Joinder of claims in Ohio is governed by Ohio Crim. R. 8, which permits joinder of charges where the offenses charged are "based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." As stated above, this Court can not grant habeas relief based on an alleged violation of state law. *See, e.g., Webber v. Scott*, 390 F.3d 1169 (10th Cir. 2004) ("To the extent [petitioner] is arguing that the joinder is improper under state law, such a claim is not a basis for federal habeas relief."). "Improper joinder does not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his . . . right to a fair trial." *U.S. v. Lane*, 474 U.S. 438, 446 n.8 (1986). *See also Coley v. Bagley*, 706 F.3d 741, 753 (6th Cir. 2013). Habeas relief in this context requires a showing of actual prejudice. *Davis v. Coyle,* 475 F.3d 761, 777 (6th Cir. 2007). *Cf. United States v. Gardiner*, 463 F.3d 445, 473 (6th Cir. 2006) ("In order to succeed on a motion to sever, a defendant must show compelling specific, and actual prejudice from a court's refusal to grant the motion to sever.") (internal quotation mark and citation omitted). Claims of misjoinder are also subject to harmless error review, which in federal habeas proceedings requires the Court to consider whether the error had "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 623 (1993) (internal quotation marks omitted).

---

WL 6324623, at *11 (S.D. Ohio Nov. 26, 2019) (finding failure-to-sever-claim procedurally defaulted where the petitioner failed to renew his motion for severance at the close of evidence) (collecting cases) (Report and Recommendation), *adopted*, 2020 WL 525472 (S.D. Ohio Feb. 3, 2020). Because, as discussed below, petitioner's Ninth Ground for relief is without merit, the Court need not determine whether petitioner's procedurally defaulted his severance claim on these bases.

Petitioner has not demonstrated that he is entitled to federal habeas relief based on his severance claim. For the reasons stated above, petitioner has failed to demonstrate that exclusion of the evidence of prior sexual relationships with the brothers-in-law, false claims of relationships with other football players, or the transmission of STDs resulted in a violation of his constitutional rights. Petitioner has also failed to show that the trial court's ruling declining to sever the charges against him resulted in actual prejudice, much less that exclusion of the evidence had a substantial and injurious effect or influence on the jury's verdict. As discussed above, petitioner failed to proffer evidence regarding the transmission of STDs and the record is devoid of any indication that the rape shield law operated to preclude it or the evidence regarding prior false allegations of relationships with other football players. *See Boggs*, 226 F.3d at 734 (noting that false allegations of rape where no sexual activity is involved do not fall within Ohio's rape shield). Absent any indication that this evidence would have been admitted if the trial was severed, petitioner has failed to demonstrate actual prejudice in connection with the trial court's ruling.

Furthermore, the trial court's ruling excluding evidence of prior sexual relationships with the brothers-in-law was only based in part on the rape shield. The trial court found, under Ohio R. Evid. 403(B) that the probative value of the evidence "is significantly outweighed by the severe prejudice it causes to the victim. (Doc. 11-11, Trans. at PageID 470). Based on the trial court's alternative basis for excluding this evidence, the record indicates that none of the excluded evidence would have been admitted even if the trial court granted petitioner's motion to sever. *Cf. Davis v. Coyle*, 475 F.3d 761, 777 (6th Cir. 2007) (finding "a risk of undue prejudice exists whenever joinder of counts permits introduction of evidence of other crimes that would

otherwise be inadmissible").  Accordingly, petitioner has failed to demonstrate actual prejudice as a result of the alleged improper joinder.

In any event, as discussed above, although petitioner claims that the relationships with the brothers-in-law were probative of his *mens rea* and relevant to the phone records, exclusion of this evidence did not result in actual prejudice or have a substantial and injurious effect or influence on the jury's verdict in light of the substantial evidence offered against petitioner.

Accordingly, petitioner is not entitled to federal habeas relief based on Grounds Five and Nine of the petition.

### E.  Ground Six is without merit.

In Ground Six, petitioner claims that the trial court improperly interpreted the "statements against interest" hearsay exception under Evid. R. 804(B)(3) in excluding testimony from petitioner's wife and neighbor that petitioner admitted to having sex with Jackson in June 2010. (*See* Doc. 1 at PageID 80-84).  Petitioner argues that the state courts improperly found the statements were against petitioner's interest at the time they were made and therefore were admissible under the exception.  As a result, petitioner claims that his constitutional rights to present a defense, to confront the state's evidence, and to due process were violated.   Also, as one of his arguments in Ground Seven of the petition, petitioner claims trial counsel was ineffective for failing to proffer his wife's testimony that petitioner confessed to having a sexual relationship with the victim in 2010.  (*See id.* at PageID 84).

The Ohio Court of Appeals dismissed petitioner's assignment of error when raised on direct appeal, reasoning as follows:

{¶64} In his sixth assignment of error, Webster claims that the trial court erred when it ruled that defense witnesses Maurice Anderson and Jennifer Webster could not testify that Webster had told each of them that he had had a sexual relationship with Jackson in June 2010.  In the alternative, Webster argues that counsel was

ineffective for failing to properly object to the court's ruling. There is no proffer in the record concerning Jennifer Webster's testimony. We therefore confine our analysis to Anderson's. *See Ishmail*, 54 Ohio St.2d 402, 377 N.E.2d 500, at syllabus.

{¶65} Defense counsel proffered that Anderson would have testified that Webster had admitted to him that Webster had had sexual intercourse with Jackson at a time when Jackson was 16 years old. Webster claims that Anderson's testimony was crucial to his defense because it established that he was having a sexual relationship with Jackson after Jackson had turned 16. We review this assignment of error for an abuse of discretion. *State v. Sage*, 31 Ohio St.3d 173, 180, 510 N.E.2d 343 (1987).

{¶66} Weber contends that the trial court improperly applied Evid.R.804(B)(3) when it determined that his statement to Anderson was inadmissible. Evid.R. 804(B)(3) provides that a statement against interest may be admitted under certain circumstances as an exception to the hearsay rule. But Evid.R. 804(B)(3) does not apply to statements made by a party to the action. 1993 Staff Note to Evid.R. 804(B)(3). A statement made by a defendant is considered an "admission," and is governed by Evid. R. 801(D)(2). An "admission" and a "statement against interest" reflect two distinct concepts and different rules of admissibility apply to each. *See Ferrebee v. Boggs*, 24 Ohio App.2d 18, 263 N.E.2d 574 (4th Dist. 1970). In pertinent part, Evid.R. 801(D)(2) provides that statements sought to be admitted at trial must be offered against the party who had made the statement.

{¶67} Here, Webster was attempting to introduce evidence that he had had a sexual relationship with Jackson in 2010–after Jackson had turned 16 years of age. The trial court properly determined that this statement was beneficial to Webster and therefore not admissible. We find no error and no ineffective assistance of counsel. Webster's sixth assignment of error is overruled.

(Doc. 11, Ex. 18 at PageID 329–30).

Petitioner is not entitled to federal habeas relief based on Ground Six of the petition.

During trial petitioner sought to have his neighbor testify that petitioner admitted to him that he had a sexual relationship with the victim in June 2010 when his wife went out of town. (Doc. 11, Trans. at PageID 1590). Petitioner claims that his wife would have offered similar testimony.[43]

---

[43] As noted by the Ohio Court of Appeals, the defense did not proffer that petitioner's wife would have testified that petitioner similarly admitted to having a relationship with the victim in 2010. (*See* Doc. 11-11, Trans. at PageID1656). Petitioner contends that counsel was ineffective for failing to do so in Ground Seven of the petition. In any event, as discussed below, because petitioner's underlying evidentiary claim is without merit, counsel was not ineffective for failing to proffer the inadmissible evidence.

As he does in the instant petition, on direct appeal petitioner argued that the trial court

misapplied Ohio R. Evid. 804(B)(3), which provides an exception to the hearsay rule for

statements against interest.  Petitioner maintains that his comments to the defense witnesses were

against his intertest at the time they were made and therefore should have been admitted at trial.

However, as noted by the Ohio Court of Appeals, under Ohio law, rule 804(B)(3) does not apply

to parties to the action.  *See State v. Gatewood*, 472 N.E. 2d 63, 64-65 (Ohio Ct. App. 1984)

(noting that Rule 804 applies to statements of persons other than parties to the action).  Instead,

statements made by parties to an action are governed by Ohio R. Evid. 801(D)(2), which

provides that an admission by a party-opponent is not hearsay when offered against a party.[44]

Because petitioner's statements were not offered against him, the Ohio Court of Appeals

correctly determined that the testimony was not admissible.  *See State v. Wesson*, 999 N.E.2d

557, 573 (Ohio 2013) ("A party may not introduce his own statement under Evid. R.

801(D)(2)(a)") (quoting *State v. Cunningham*, 824, N.E.2d 504, ¶ 105 (Ohio 2004)); *Leal v.

Morris*, No. 87-3014, 1988 WL 25007, at *7 (6th Cir. Mar. 18, 1988) ("In Ohio, a party may not

introduce his own statement; it must be offered by the opposing party.") (citing Ohio Evid. R.

801(D)(2)(a)); *State v. Gatewood*, 472 N.E.2d 63, 65 (Ohio App. Dist. Mar. 28, 1984) ("The

Staff notes to Evid. R. 801(D)(2)(a), treating the subject of a party's own statement, specify

positively that "a party may not introduce his own statement under this rule.").

In any event, petitioner is not entitled to federal habeas relief to the extent that he claims

the Ohio courts misapplied Ohio law.  28 U.S.C. § 2254(a); *Pulley v. Harris*, 465 U.S. 37, 41

---

[44] The Staff Notes to Evid R. 804(B)(3) states: "The declaration against interest applies to statements of persons other than parties to the action and should be distinguished from statements of parties to the action.  The out-of-court statement of a party opponent in the action is an admission, not a declaration against interest.  An admission of a party opponent is governed by Rule 801(D)(2)."

(1984). *See also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal court to reexamine state-court determinations on state-law questions"). This Court is bound by the state court's interpretation of state evidentiary law. *Brooks v. Anderson*, 292 F. App'x 431, 437-38 (6th Cir. 2008) ("this Court has held that federal habeas courts must defer to a state court's interpretation of its own rules of evidence and procedure when assessing a habeas petition.") (internal quotation marks and citations omitted). "Errors by a state court in the admission of evidence are not cognizable in habeas corpus proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994) (citing *Logan v. Marshall*, 680 F.2d 1121, 1123 (6th Cir. 1982)).

No such showing has been made in this case, as the exclusion of the hearsay evidence did not rise to the level of a constitutional violation. *See Montana*, 518 U.S. at 42 (finding "the proposition that the Due Process Clause guarantees the right to introduce all relevant evidence is simply indefensible. As we have said: 'The accused does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under the standard rules of evidence.'") (quoting *Taylor v. Illinois*, 484 U.S. 400, 410 (1988)). With respect to petitioner's rights under the Confrontation Clause, petitioner had ample opportunity to cross-examine the State's witnesses as to the timing of his relationship with the victim. Further, petitioner's right to present a defense was not violated because, as argued by respondent, the excluded evidence was only marginally probative. The fact that petitioner may have admitted to having a sexual relationship with the victim in 2010 did not preclude his also having a sexual relationship with her in 2009. Because the excluded evidence was neither critical nor exculpatory, and did not

create a reasonable doubt that did not otherwise exist, the evidentiary ruling did not violate petitioner's right to present a defense. *See Shoemaker*, 600 F.App'x at 984.

Finally, because petitioner's underlying claim is itself without merit, trial counsel was not ineffective for failing to proffer Jennifer Webster's testimony. *Martin*, 45 F. App'x at 381–82 ("Failure of trial counsel to raise wholly meritless claims cannot be ineffective assistance of counsel.").

Accordingly, petitioner is not entitled to federal habeas relief based on Ground Six or his related ineffective assistance of counsel claim raised in Ground Seven of the petition.

### F. Ground Seven is without merit.

In Ground Seven, petitioner claims that his trial counsel was ineffective for failing to object to a leading question regarding the November 2009 charge and impermissibly affixed a timeframe to the occurrence of sexual conduct during cross-examination. According to petitioner, without the resulting testimony the record would be void of evidence to establish the November 2009 charge.[45]

Petitioner raised this claim in his seventh assignment of error on direct appeal. (*See* Doc. 11, Ex. 15 at PageID 186–87). The Ohio Court of Appeals overruled petitioner's assignment of error, reasoning as follows:

> {¶ 68} In his seventh assignment of error, Webster claims that he was convicted of the November 2009 charge due to trial counsel's errors.
>
> {¶ 69} To establish a claim for ineffective assistance of counsel, Webster must show that his attorney's performance was deficient and that "but for" the deficiency, there is a reasonable probability that the outcome of his trial would have

---

[45] Petitioner also advances several additional alleged instances of ineffective assistance of counsel in Ground VII. These include counsel's failure to proffer evidence regarding the transmission of an STD in 2010, prior false allegations of relationships with other football players, and argue that the State waived the rape shield protection, as discussed in Ground V, as well as counsel's failure to proffer Jennifer Webster's testimony that Webster confessed to having a sexual relationship with Jackson in 2010 or the proper interpretation of the statements against interest as discussed in Ground VI. (*See* Doc. 1 at PageID 84). Because the Court has already found these claims without merit, they are not again addressed in this section.

been otherwise. *Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; *Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373.

{¶ 70} Webster asserts that counsel failed to object to a leading question concerning whether Jackson had had sexual intercourse with Webster in November 2009. He also asserts that counsel led Jackson to repeat the November 2009 timeframe on cross-examination. According to Webster, without these alleged errors, there was no evidence that he had had sexual intercourse with Jackson in November 2009.

{¶ 71} Webster takes issue with this question:
And then in November 2009, you said that you continued to see the defendant maybe two to three times a week. How would you get out of the house to go see the defendant?

{¶ 72} Prior to posing this question, the assistant prosecuting attorney had already established that he was asking Jackson questions concerning the timeframe of October to November 2009. Also prior to posing this question, Jackson had testified that she had been having sexual intercourse with Webster two to three times a week before she had been caught by her mother in Webster's car, and that she had continued to see him with the same frequency after she had been caught and "grounded." And Michelle Jackson had already testified that she had discovered Webster and Jackson together on October 30, 2009. Hue Jackson had corroborated Michelle's testimony. Consequently, the November 2009 timeframe had been established by Jackson and by her parents before this question had been posed. The "leading" part of this question was permissible under Evid.R. 611(C) as a means to aid the jury in understanding that the state was asking how Jackson managed to see Webster after she had been "grounded." *See State v. D'Ambrosio,* 67 Ohio St.3d 185, 190, 616 N.E.2d 909 (1983). This single question did not establish the November 2009 timeframe as asserted by Webster. And counsel's performance was not deficient for failing to object.

{¶ 73} Nor was counsel's performance deficient when she "led" Jackson to repeat the November 2009 timeframe on cross-examination. Each of Webster's charges was tied to a specific month. The state had presented evidence that Webster and Jackson had engaged in sexual conduct in November 2009. Defense counsel's questions concerning November 2009 attempted to discredit Jackson's version of events. This was sound trial strategy and therefore does not constitute ineffective assistance of counsel.

{¶ 74} Webster's seventh assignment of error is overruled.

(Doc. 11, Ex. 18 at PageID 330–32).

The Ohio Court of Appeals court reasonably determined that counsel was not ineffective.

As an initial matter, the appeals court determined that the leading portion of the question was

proper under Ohio Rules of Evid. 611(C), which states that "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony."  Because the state courts are the final authority on state-law issues, this Court must defer and is bound by the state court's interpretation. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions").  Therefore, counsel was not ineffective for failing to object to the leading question. *See Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001) ("counsel cannot be ineffective for a failure to raise an issue that lacks merit").

Regardless, the Ohio Court of Appeals also reasonably determined that the November 2009 timeframe was established prior to the contested leading questions.  The victim, Jackson, testified that she met petitioner for sex in September and October 2009 through the ruse of baby sitting or after petitioner would pick her up from the Kelly home.  (Doc. 11-7, Transcript at PageID 1059).  The prosecution proceeded to question Jackson about being caught in petitioner's car, which resulted in her no longer babysitting for petitioner and being grounded.  (*Id.* at PageID 1060–63).  Hue and Michelle Jackson previously testified that this occurred on October 30, 2009.  Jackson testified that she continued to have sex with petitioner after she stopped babysitting, specifying that she had sex with him "six or seven more times" and would see petitioner "at the most two or three times a week, and sometimes I would go a week or two without even seeing him."  (*Id.* at PageID 1058; 1064).  The prosecution subsequently asked Jackson if there were any changes in her life at home "[d]uring this time period of October, November of 2009."  (*Id.* at PageID 1065).  Then—in the first contested leading question—the prosecution inquired how she would get out of the house while being grounded, referencing

Jackson's prior testimony that she continued to see petitioner two or three times a week following the October 30, 2009 incident:

> Q. And then in November of 2009 you said that you continued to see the defendant maybe two or three times a week. How would you get out of the house to go see the defendant?

(*Id.* at PageID 1066). Because the time period was clearly established by the preceding testimony, the state appeals court reasonably determined that trial counsel was not ineffective for failing to object to the prosecutor's question.

The same is true for defense counsel's subsequent question on cross-examination. Petitioner takes issue with trial counsel allegedly attaching a timeframe to the occurrence of sexual conduct during cross-examination in the following question:

> Q. Now during the time period in September '09, October, November, when all of these text messages are going from you to Nate, on these occasions you would initiate the contact and initiate sexual activity, correct?

(*Id.* at PageID 1213). Petitioner argues that without the question, no evidence of sexual conduct was presented with respect to the November charge. However, as is stated above, the time period of the alleged sexual conduct had already been established.[46] Specifically, each of the charges against petitioner was tied to a specific month (including November), the prosecution

---

[46] In fact, counsel did object to a prior question on the basis that it was leading. As noted by the trial court, the victim had already testified as to their relationship in November:

> Q. And that would be when you continued having sex in November of 2009 up to when he left town in December of 2009?

> [Defense Counsel]: Objection.

> [Defense Counsel]: Objection to the leading nature of the question.

> THE COURT: All right. She's already testified. You can cross her on it, but that question's consistent with her current testimony so it's allowed.

(*Id.* a PageID 1103).

had already presented evidence through testimony and the phone records that petitioner engaged in sexual contact with the victim in November,[47] and defense counsel's question was aimed at establishing that the victim initiated the phone contacts and sexual relations between them.  (*See Id.* at PageID 1214-15).  Certainly, as noted by the appeals court, it was sound trial strategy for defense counsel to question the victim about her relationship with petitioner in November and to address the November charge specified in the indictment.  The mere fact that counsel mentioned November in the course of this questioning does not amount to ineffective assistance of counsel.

Accordingly, because petitioner has failed to demonstrate that the Ohio Court of Appeals' decision was based on an unreasonable determination of the facts or involved an unreasonable application of Supreme Court precedent, petitioner is not entitled to federal habeas relief based on Ground Seven of the petition.

Accordingly, in sum, the undersigned concludes that petitioner is not entitled to habeas relief and the petition should be **DENIED** with prejudice.

### IT IS THEREFORE RECOMMENDED THAT:

1.  Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be **DENIED** with prejudice.

2. A certificate of appealability should not issue with respect to the claims alleged in the petition, which have been addressed on the merits herein, because petitioner has not stated a "viable claim of the denial of a constitutional right," nor are the issues presented "adequate to deserve encouragement to proceed further."  *See Slack v. McDaniel*, 529 U.S. 473, 475 (2000)

---

[47] This included the victim's testimony that she continued to have sex with petitioner several times a week after being grounded on October 30, 2009, by meeting in petitioner's car after saying she was going on a run; Mrs. Jackson's corroborating testimony that she witnessed petitioner's car leave after the victim left the house; the phone records of fifty-seven text messages and 125 calls in November; and petitioner's admission that he arranged to meet the victim for sex using the phone.

(citing *Barefoot v. Estelle,* 463 U.S. 880, 893 & n.4 (1983)). *See also* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

A certificate of appealability should not issue with respect to the claims alleged in the petition, which this Court has concluded are waived and thus procedurally barred from review, because under the first prong of the applicable two-part standard enunciated in *Slack v. McDaniel,* 529 U.S. 473, 484–85 (2000), "jurists of reason" would not find it debatable whether this Court is correct in its procedural ruling.

3. With respect to any application by petitioner to proceed on appeal *in forma pauperis,* the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would not be taken in "good faith," and, therefore, should **DENY** petitioner leave to appeal *in forma pauperis* upon a showing of financial necessity. *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman,* 117 F.3d 949, 952 (6th Cir. 1997).

*s/Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

NATHANIEL WEBSTER, JR.,          Case No. 1:15-cv-329
      Petitioner,

                                    Black, J.

      vs.                            Bowman, M.J.

WARDEN, BELMONT
CORRECTIONAL INSTITUTION,
      Respondent.

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of
the recommended disposition, a party may serve and file specific written objections to the
proposed findings and recommendations.   This period may be extended further by the Court on
timely motion for an extension.  Such objections shall specify the portions of the Report objected
to and shall be accompanied by a memorandum of law in support of the objections.  If the Report
and Recommendation is based in whole or in part upon matters occurring on the record at an oral
hearing, the objecting party shall promptly arrange for the transcription of the record, or such
portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the
assigned District Judge otherwise directs.  A party may respond to another party's objections
**WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in
accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140
(1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).